(No. 58910

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CORNELIUS LEWIS, Appellant.

*Opinion filed November 30, 1984.—Rehearing denied February 1, 1985.*

CLARK and SIMON, JJ., dissenting.

J. Steven Beckett, of Reno, O'Byrne & Kepley, P.C., of Champaign, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Michael A. Ficara, Mark L. Rotert, and Neal B. Goodfriend, Assistant Attorneys General, and Steven D.

Pearson, of Chicago, of counsel), for the People.

PER CURIAM: This is the defendant's second appeal before this court. This appeal is taken from an order of the circuit court of Champaign County denying the defendant, Cornelius Lewis, relief on the basis of his post-conviction petition. The defendant was convicted of murder, aggravated kidnaping and armed robbery. On June 22, 1979, the defendant was sentenced to death. On direct appeal to this court, we affirmed the judgment of the circuit court. (*People v. Lewis* (1981), 88 Ill. 2d 129 (hereinafter referred to as *Lewis I*).) The United States Supreme Court denied defendant's petition for a writ of *certiorari. Lewis v. Illinois* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1038, 102 S. Ct. 2307.

On August 16, 1982, the defendant filed a petition for post-conviction relief in Macon County, the county in which the original charges against him were filed. The defendant's petition was transferred to Champaign County by order of this court. The post-conviction hearings were held on the petition, and on July 14, 1983, the circuit court of Champaign County issued a written memorandum opinion and order denying defendant's request for post-conviction relief. The defendant appealed to the Appellate Court, Fourth District. We then granted the State's motion to transfer this appeal directly to this court.

We will not repeat the facts in this case except as they relate to the disposition of the issues the defendant has raised in this appeal.

### JURISDICTION

Defendant argues that his right to substantive due process was violated when we transferred this case from the appellate court. He contends that this court does not have jurisdiction to hear his post-conviction appeal and

that proper jurisdiction lies with the Fourth District Appellate Court. Defendant bases his argument on Supreme Court Rule 651(a) (87 Ill. 2d R. 651(a)), which provides in pertinent part: "An appeal from a final judgment of the circuit court in any post-conviction proceeding lies to the Appellate Court in the district in which the circuit court is located."

Although Rule 651(a) is concerned with post-conviction appeals, we interpret article VI, section 4(b), of the Illinois Constitution (Ill. Const. 1970, art. VI, sec. 4(b)), the Illinois death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1 *et seq.*), and Supreme Court Rule 603 (87 Ill. 2d R. 603) to mandate uniform statewide appellate review of cases in which the death sentence has been imposed, even when those cases reach the post-conviction appeal stage.

Article VI, section 4(b), of the Constitution provides in pertinent part: "Appeals from judgments of Circuit Courts imposing a sentence of death shall be directly to the Supreme Court as a matter of right." Ill. Const. 1970, art. VI, sec. 4(b).

Section 9—1(i) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(i)) provides: "The conviction and sentence of death shall be subject to automatic review by the Supreme Court. Such review shall be in accordance with rules promulgated by the Supreme Court."

Supreme Court Rule 603 provides in pertinent part: "[A]ppeals by defendants from judgments of the circuit courts imposing sentence of death shall lie directly to the Supreme Court as a matter of right. All other appeals in criminal cases shall be taken to the Appellate Court." 87 Ill. 2d R. 603.

Defendant's brief states: "Death penalty cases are certainly significant and controversial cases, but they should not be handled on an *ad hoc* basis." We agree

with the defendant that death penalty cases are too important to be handled on an *"ad hoc"* basis. It is for this very reason that we cannot accept defendant's position. If we were to allow appeals from post-conviction hearings in death cases to go to the appellate court, those cases might not receive a uniform review.

The defendant, as well as this court, is concerned about *"ad hoc"* handling of death penalty cases. The defendant argues that at some future date this court, relying on Rule 651, may not take a case directly on a post-conviction appeal, thereby treating a death case on an *"ad hoc"* basis. However, if defendant's argument regarding jurisdiction were correct, defendant or some other defendant who has been sentenced to death could lose a post-conviction appeal in the appellate court and this court could then deny the petition for leave to appeal. In this respect there could be *"ad hoc"* treatment of a death penalty case. Also, a defendant whose petition for leave to appeal was denied could allege that he was denied equal protection or denied his right to uniform statewide appellate review of his death sentence.

The Constitution, the legislature and this court have made special provisions for death cases because of their significance. To treat a post-conviction appeal in a death penalty case differently than a direct appeal in a death penalty case would be inequitable.

In two other cases now pending before this court, *People v. Gaines* (1984), 105 Ill. 2d 79, and *People v. Ruiz*, No. 60303, we have granted the State's motion to transfer the case from the appellate court to this court. So to date, there has not been *"ad hoc"* treatment of any death penalty post-conviction appeal by this court.

## BRADY VIOLATION

The next issue to be addressed, which was not addressed in *Lewis I*, is whether, as defendant argues,

there was a violation of the rule set forth in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. In *Brady*, the court stated, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97.

During the police investigation of this case, two negroid hairs suitable for analysis were found. One was found in a ski mask used in the robbery, and the other was found in the back-seat area of the maroon Monte Carlo automobile which was used in the robbery. These two hair samples were compared with hair standards obtained from Cornelius Lewis, Bernice Lewis, and Maurice Farris, three of the people charged with the robbery. All three were black. The standards from the Lewises were obtained in March 1979, while the standard from Farris was obtained in May 1979. The FBI compared these standards with the hair samples found in the ski mask and the car and excluded the Lewises as the source. The tests also excluded Farris as the source of the hair found in the ski mask, but were inconclusive with regard to Farris as the source of the hair found in the car.

The defendant alleges that the prosecutor suppressed an FBI laboratory report dated May 17, 1979. This report contained the results of the tests on the hair standards taken from Cornelius Lewis, Bernice Lewis, and Maurice Farris.

The defendant argues that, without this report, his trial attorney, Kenneth Kinser, was unaware that a hair standard was taken from Farris and analyzed by the FBI. Therefore, Kinser was unaware that Farris was not excluded as the source of the hair sample obtained from the car. The defendant also theorizes that this evidence

shows Farris lied when he testified that he drove the car, since the results of the hair analysis suggests that Farris was in the back seat of the car. The defendant bases his theory on the premise that since Farris' hair was analyzed shortly before trial, the prosecutor believed that the wrong man was given immunity. The defendant also believes that since the hair-analysis results excluded him, they also negated his guilt. The defendant further argues that the results of the hair analysis support his theory that Farris was the actual murderer. The defendant concludes that this evidence was therefore material to the punishment he received, since he argues that he could only receive the death penalty if he were the gunman. The defendant's ultimate conclusion is that since the hair-analysis results on Farris were material to his guilt and/or punishment, he was denied due process of law.

The record does not clearly establish whether Kinser received the laboratory report in question. The record does indicate, however, that: (1) Kinser knew the results of the test conducted on Cornelius Lewis' and Bernice Lewis' hair standards; (2) the report of the hair analysis was hand carried from the FBI laboratory in Washington, D.C., to Champaign County, Illinois, where the trial was in session; (3) three copies of the report were delivered to the prosecutor at the courthouse on May 21, 1979; (4) on the day the report was delivered to the prosecutor, Kinser had moved for a mistrial and the atmosphere at the trial was hectic.

In *People v. Williams* (1980), 91 Ill. App. 3d 631, 633-34, the court stated:

"A violation of due process occurs when a prosecutor, regardless of motive, suppresses evidence material to the question of the accused's guilt or innocence after there has been a request for its production. (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct.

1194.) To prove there has been a violation it must be shown that the evidence was suppressed following a request for it by the defendant and that the evidence was favorable to the defendant and material either to guilt or to punishment. (*Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562; *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40; *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 394 N.E.2d 1340.) Materiality in a constitutional sense is not the mere possibility that the undisclosed information might have helped the defense or affected the outcome of the trial. Rather, the omitted evidence is material if, when evaluated in the context of the entire record, it creates a reasonable doubt of the defendant's guilt. *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; *People v. Abendroth* (1977), 52 Ill. App. 3d 359, 367 N.E.2d 571."

Although the defendant has failed to point out specific discovery requests and orders entered in this case, we note that Kinser requested that the prosecution produce all reports it had access to, including FBI reports. In addition to this discovery request, identical pretrial discovery orders were entered on March 14, 1979, and on April 12, 1979. Those orders provided:

"IT IS HEREBY ORDERED that the State shall disclose to the defense counsel for the above named defendant(s), the following material and information within its possession or control: ***

(4) Any reports or statements of experts, made in connection with this case, including results of physical or mental examinations and of scientific tests, experiments or comparisons.

* * *

(7) Any material or information within the State's possession or control which tends to negate the guilt of said defendant(s) as to the offense charged, or would tend to reduce their punishment therefore.

* * *

IT IS FURTHER ORDERED that if subsequent to compliance with the above order, the State discovers ad-

ditional material or information which is subject to disclosure under the terms of this order, it shall promptly disclose such material or information to counsel for the defendant(s) and also notify the court of its existence. ***"

Our Rule 415(b) (87 Ill. 2d R. 415(b)) imposed the same continuing duty to disclose on the prosecution as the court orders of March 14 and April 12. The pretrial discovery orders referred to above provided that the State was to disclose the results of "comparisons" that it had in its possession. The State first had the results of the hair-analysis comparisons in its possession on May 21, 1979, subsequent to the time the pretrial discovery orders were entered. However, the pretrial discovery orders and our Rule 415(b) provided that if the State received the comparisons after the time in which the State complied with discovery, the State was to disclose the information to the defendants' attorneys and was to notify the court as well. When the State fails to comply with its continuing duty to disclose, the defendant will only receive a new trial if the information which was withheld was material. *People v. Davis* (1982), 104 Ill. App. 3d 1027, 1032.

The record indicates that, at the very least, Kinser knew the results of the hair-analysis comparisons on Cornelius and Bernice Lewis on May 2, 1979. In addition, at the post-conviction hearing, Kinser testified that he had a "faint recollection" of receiving the report. The record does not preclude the conclusion that Kinser received the report at trial. If Kinser received the report, it was received on the sixth day of trial.

The defendant argues that even if the report was produced on the sixth day of the trial, a *Brady* violation still occurred. The defendant cites *People v. Elston* (1977), 46 Ill. App. 3d 103, for this proposition. We do not believe that *Elston* applies to the case at bar. In *Elston*, the defendant was charged with murder and armed robbery.

Before trial, the defendant was placed in a lineup. Witnesses to the crime were unable to identify the defendant. After the jury had been selected, but prior to the actual trial, the defendant became aware that the witnesses had not identified him. Instead of suppressing the identifications, the trial court allowed defense counsel several short recesses to prepare for cross-examination. The defendant was convicted. On appeal, the appellate court found that the recesses disrupted the trial and did not give defense counsel enough time to prepare for a proper cross-examination. The appellate court therefore held that the defendant was denied a fair trial and granted the defendant a new trial.

In the case at bar, on May 8, 1979, the trial judge became aware that the prosecutor and defense attorneys were waiting for an FBI laboratory report. At that time, the trial judge indicated that he would afford the attorneys any relief they would need with respect to the report. If Kinser received the report, he failed to request a recess at that time to study the report. Kinser's trial strategy may have been not to use this evidence. This point is discussed in the section dealing with ineffective assistance of counsel.

In any event, this case is not similar to *Elston*, where the appellate court found that the trial court failed to give defense counsel adequate time to prepare cross-examination and that the recesses disrupted the trial.

As already stated, the record does not preclude the conclusion that Kinser received the report from the prosecutor. However, for our analysis, we will assume *arguendo* that the report was not received and therefore that the defendant and his counsel knew nothing of the results of the hair-analysis comparisons on Farris' hair or even that a hair standard was taken from Farris. Consequently, to have a due process violation, the omitted evidence, the hair-analysis results on Farris' hair standard, must be material. They must create a reasonable doubt as to defend-

ant's guilt which did not otherwise exist. (*United States v. Agurs* (1976), 427 U.S. 97, 112, 49 L. Ed. 2d 342, 355, 96 S. Ct. 2392, 2402.) To determine if a reasonable doubt would now exist as to the defendant's guilt requires that the hair-analysis results regarding Farris "be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. 97, 112-113, 49 L. Ed. 2d 342, 355, 96 S. Ct. 2392, 2402.

We now turn to the evidence presented at trial. The record established that, at the time of the robbery and murder, Cornelius Lewis was a resident of Minnesota. The evidence also established that, shortly before the robbery, he rented a maroon Monte Carlo from a car dealer in St. Paul. Two witnesses testified that they saw this car the morning of December 14, 1978, in the parking lot from which the Lewises and Farris obtained the second car. The Monte Carlo was later seized in Maurice Farris' garage. An Illinois roadmap with the defendant's fingerprints was found inside the car, along with a wallet containing identification of a Denise Lewis, an alias used by Bernice Lewis.

There were five eyewitnesses to the robbery and murder. All five were bank tellers and were seated in the van which was to take them to the drive-in teller facility. Each teller had placed in the van a black briefcase which contained the money she was to use that day, as well as her personal items. The eyewitnesses' testimony established that there were two robbers, both of whom they believed to be men. The eyewitnesses' testimony also established that the gunman wore gloves, was taller than the second robber, and that the gunman drove the getaway car.

A witness who was in a parking lot near the bank testified that she saw two people with ski masks get into a car.

She also testified that the driver was the taller of the two.

At trial there was evidence as to the heights of Cornelius Lewis, Bernice Lewis, and Maurice Farris. An FBI agent testified that Cornelius Lewis told the agent that he was 6 feet 2 inches tall. Farris testified that he was 5 feet 8 inches tall, that Bernice Lewis was 5 feet 10 inches or 5 feet 11 inches tall, and that Cornelius Lewis was at least 6 feet tall.

As already noted, Maurice Farris testified at trial. He was arrested and charged in connection with the bank robbery and murder. However, he received immunity in exchange for his testimony at the Lewises' trial and at Willie T. Sangster's trial. Farris testified that on the morning of December 13, 1978, he picked up the Lewises at Margaret Morgan's house, where they were staying. That morning, the Lewises and Farris drove to various locations attempting to locate a car which they could steal and use in the robbery. Farris testified that they were unable to locate a car that morning and therefore had to postpone the robbery. On the morning of December 14, 1978, Farris again met the Lewises at the Morgan house. On that morning, they were able to steal a car to use in the robbery. After they stole the car, the Lewises went to the bank and Farris went to a prearranged location where the Lewises were to return after the robbery. After the Lewises arrived at the prearranged location, Farris drove them back to Margaret Morgan's. Farris testified that, on the way back to the Morgan house, both Lewises were hiding in the car, and that they heard a siren. Bernice asked Farris about the siren. Farris testified: "I told her it's an ambulance. And she said it is going downtown to the Bank. And I said what happened. And Bobby [Cornelius] said—he said the guard went for his gun. I had to burn him."

Margaret Morgan also testified for the State. She stated that Willie T. Sangster, the alleged mastermind of the robbery, arranged for the Lewises to stay at her home

while they were in Decatur. Morgan testified that she awoke the morning of December 14, 1978, before 7 o'clock and that the Lewises were already gone. She testified that she drove her daughter to school that morning and that, when she returned home, the Lewises had returned and had three black briefcases. Mrs. Morgan also testified that, later on during the morning of December 14, she saw the Lewises counting money at her coffee table and that after dinner Cornelius used her phone to make a number of calls. Margaret Morgan also testified that she, along with a neighbor and her daughter, drove the Lewises to an Iowa bus station and that the Lewises gave her money.

Dwight David, an in-law of the Lewises, testified at trial as well. He testified that around December 18, 1978, Cornelius Lewis visited him at his home in Minnesota. David stated that at the time of the visit Cornelius brought a vodka box containing money which Cornelius asked David to keep for him.

In addition to the evidence already referred to, other incriminating evidence was introduced which pointed towards Cornelius Lewis' involvement in the robbery and murder. "A .38-caliber handgun, identified by the testimony of a Minnesota gun dealer and other witnesses as having been 'pawned' to defendant, was found in the Macon County landfill in the area with decedent's gun and items identified by three of the bank tellers as having been in their briefcases on the morning of the murder. Telephone bills showed calls between Lewis residences in Minneapolis and Des Moines and the Morgan and Sangster-Farris residences in Decatur." (*People v. Lewis* (1981), 88 Ill. 2d 129, 152-53.) The testimony of two of Margaret Morgan's neighbors and one of her children placed Bernice and Cornelius Lewis in the Morgan household from December 12 through 14, 1978.

In *Lewis I*, we stated that the reasonable-doubt issue was a question of the credibility of witnesses. We noted in

*Lewis I*, and we note again here, that the jury apparently believed the State's witnesses. In *Lewis I*, we stated: "In our judgment the evidence of guilt, if believed by the jurors, was ample." (88 Ill. 2d 129, 153.) We still believe this to be true.

The jury decided that there was no reasonable doubt as to the defendant's guilt. We agree. We also do not believe that the testimony at the post-conviction hearing regarding the hair analysis on Farris' hair standard, the "omitted evidence," in view of the entire record, creates a reasonable doubt as to the defendant's guilt that did not otherwise exist.

At the post-conviction hearing, Agent Burwitz, the FBI agent who conducted the hair-analysis tests, testified that there were certain similarities and differences between Farris' hair standard and the sample from the Monte Carlo. Because of this, he stated: "Therefore, no conclusion was reached by me as to whether or not this hair came from Maurice Farris." The following exchange then took place:

Q. "Were you able to eliminate that as a possibility?

A. "No, but neither was I able to associate him or to infer that he could be the source."

During cross-examination the following exchange took place between the prosecutor and Burwitz:

Q. "Is there any scientific value in the conclusions that there are similarities and dissimilarities?"

A. "In my opinion it doesn't really add anything one way or the other."

The Supreme Court has stated that "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (*United States v. Agurs* (1976), 427 U.S. 97, 109-10, 49 L. Ed. 2d 342, 353, 96 S. Ct. 2392, 2400.) The test results excluded Farris as the source of the hair found

in the ski mask and were inconclusive with regard to Farris being the source of the hair found in the car. Even if the test results were conclusive that Farris was the source of the hair found in the car it would have only been a "mere possibility" that the report might have helped the defense or affected the outcome of the trial. Under *Agurs,* this would not have been enough.

In this case, the test results were inconclusive with regard to Farris' hair and the hair found in the back seat. The test results added nothing one way or the other; they were not material to either guilt or punishment. In conclusion, then, the report does not create a reasonable doubt that did not otherwise exist when evaluated in the context of the entire record.

Defendant also argues that, even when a defendant is aware that evidence exists, a *Brady* violation can occur. Defendant cites *People v. Nichols* (1976), 63 Ill. 2d 443, for this proposition. In *Nichols,* the defendants were convicted of attempted rape, burglary, and armed robbery. A shoe was found at the scene of the crime. The State failed to produce the shoe, even though the defendants requested all exculpatory evidence. On appeal, the State argued that the defendant knew about the shoe and made no attempt to obtain it. The State believed that the shoe was not material or favorable to the defendants. This court rejected the State's argument, noting:

> "The defendants denied the crimes and presented defenses of alibi. They sought to demonstrate that the victims had been mistaken in their identification of them and that other persons had committed the crimes. The shoe was found outside one of the windows of the apartment, and grand jury and trial testimony suggested that one of the intruders may have entered through this window. Too, during the course of the trial, a police evidence technician testified that he had found an identifiable palm print on a wall near this window and that the print was not one of the defendant's or any of the victims'. The

shoe must be considered as evidence favorable to the defendants and should have been turned over to them *** ." *People v. Nichols* (1976), 63 Ill. 2d 443, 448.

In this case, Kinser knew of the test results on his client. Kinser testified at the post-conviction hearing that there were many explanations for the results. Apparently, it was his trial strategy not to use this information. Again, the section of this opinion dealing with ineffective assistance of counsel discusses this point.

Since we have concluded that the results contained in the hair-analysis report were not material to the defendant's guilt or punishment, we need not address the defendant's claim that he could not have been sentenced to death if Farris was the actual murderer.

For the foregoing reasons, we hold that the prosecutor did not violate his constitutional duty to provide the defendant with exculpatory material. Therefore, on this issue, the defendant is not entitled to a new trial.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In his petition for post-conviction relief and in his post-conviction appeal before this court, defendant asserts that he was denied effective assistance of counsel. The defendant also raised this issue in his direct appeal to this court (*People v. Lewis* (1981), 88 Ill. 2d 129). The defendant argues that even though this court addressed the issue of ineffective assistance of counsel in *Lewis I*, the instant appeal is based on additional information which was elicited at the post-conviction hearing. The defendant also believes the additional information places into context several issues which this court allegedly was unable to address conclusively in his initial appeal.

The defendant asserts that the proper constitutional standard to be applied in determining the question of effective assistance of counsel is "whether counsel's conduct 'meets a minimum standard of professional representation.'

*United States ex rel. Williams v. Twomey* 510 F.2d 634, 641 (7th Cir. 1975)." In the recent case of *People v. Albanese* (1984), 104 Ill. 2d 504 (*Albanese II*), this court addressed the various standards which have been applied to determine whether a defendant has been denied effective assistance of counsel. In *Albanese II* we discussed the case of *Strickland v. Washington* (1984), 466 U.S. ___, 80 L. Ed. 2d 674, 104 S. Ct. 2052. In *Strickland,* the court adopted a standard which appears to combine the elements of the standard enunciated in *People v. Greer* (1980), 79 Ill. 2d 103, 120-21 (actual incompetence of counsel entitles the defendant to a new trial if the incompetence created such substantial prejudice that the trial result probably would have been different) and the standard enunciated in *United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634, 641 (the sixth amendment entitles defendants to representation that meets minimum standards of professional representation). In *Albanese II*, we stated:

"Although we do not foresee that application of the *Strickland* rule will produce results that vary significantly from those reached under *Greer*, we hereby adopt the Supreme Court rule for challenges to effectiveness of both retained and appointed counsel (see *People v. Royse* (1983), 99 Ill. 2d 163, 170) and reject the single-component test of *Twomey*." 104 Ill. 2d 504, 526-27.

It is clear that this court adhered to the *Greer* standard at the time of defendant's trial and sentencing hearing. (See *People v. Lewis* (1981), 88 Ill. 2d 129, 153-54.) Whether we apply the *Greer* standard or the standard enunciated in *Strickland* to the instant appeal, we do not believe this defendant was denied effective assistance of counsel.

In *Greer*, we held that a defendant was entitled to a new trial if his "appointed counsel was actually incompetent, as reflected in the performance of his duties as trial attorney, and if this incompetence produced substantial

prejudice to the defendant without which the result of the trial would probably have been different." *People v. Greer* (1980), 79 Ill. 2d 103, 120-21.

In *People v. Mack* (1984), 105 Ill. 2d 103, this court summarized the *Strickland* standard and stated:

> "As announced in *Strickland*, the test for effective assistance of counsel has two prongs:
>
>> 'First, the defendant must show that counsel's performance was deficient [by] showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' (466 U.S. ___, ___, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.)
>>
>> 'In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. \* \* \*
>>
>> Judicial scrutiny of counsel's performance must be highly deferential. \* \* \* [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' (466 U.S. ___, ___, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065.)
>>
>> 'When a defendant challenges a death sentence \* \* \* the question is whether there is a reasonable probability that, absent the errors, the sentencer-including an appellate court, to the extent it independently reweighs the evidence-would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' 466 U.S. ___, ___, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2069.
>
> In developing the reasonable-probability test, the court stated that it is not enough for the defendant to show

that the errors had some conceivable effect on the out-come of the proceeding, because '[v]irtually every act or omission of counsel would meet that test ***.' (466 U.S. ____, ____, 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2067.) On the other hand, the 'defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case.' (466 U.S. ____, ____, 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2068.) The appropriate standard of prejudice, the court stated, should be some-what lower because '[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself un-fair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.' (466 U.S. ____, ____, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) Thus the court settled on the rea-sonable-probability test and stated:

'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional er-rors, the result of the proceeding would have been dif-ferent.' (466 U.S. ____, ____, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.)

The court further stated that '[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.' 466 U.S. ____, ____, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068." 105 Ill. 2d 103, 129-31.

In the instant case, the defendant separates his argu-ment on ineffective assistance of counsel into two sections. In the first section, he maintains that from the full content of the post-conviction record it is clear that his attorney was not qualified to represent him because of his attor-ney's background, philosophies, attitudes, and lack of effort to investigate or prepare for trial. The second section fo-cuses on defense counsel's alleged inadequacy because this was a capital case.

We do not agree with the defendant that anything in the post-conviction record demonstrates that "Mr. Kinser's age, experience, background and personal make-up ren-dered him completely unequipped to act as a conscientious

and zealous advocate" on behalf of the defendant. Kinser testified that he had been retained in "well over a hundred" criminal cases, of which probably 50 were felonies, and that he had kept abreast of changes in the criminal law by reading numerous legal publications and attending seminars.

The chief judge of the Sixth Judicial Circuit, Judge Scott, who appointed Kinser in this case, testified at the hearing on defendant's post-conviction petition and stated that he had observed Kinser in court on numerous matters and believed him to be an experienced attorney in criminal matters. He further stated that he was not aware of any conflict that would arise because of the nature of Kinser's practice or of anything that would cause any problem with Kinser representing the defendant. Judge Scott had previously appointed Kinser as a defense counsel on other criminal matters.

The defendant's assertion that Kinser was unable to properly represent him because of his background, philosophies, attitudes, and alleged lack of experience is without merit. It is important to point out that Kinser is not on trial here. The fact that Kinser was a religious man, as the defendant maintains, is not relevant unless it rendered him "actually incompetent" and "produced substantial prejudice to the defendant without which the result of the trial would probably have been different," the *Greer* standard; or "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," the *Strickland* standard. Neither standard is met in this case.

The first claim we will address concerns Kinser's alleged failure to investigate certain alibi witnesses and have them testify. Prior to trial, the defendant gave Kinser the names of potential alibi witnesses in Des Moines, Iowa. Kinser wrote to these people immediately, but never received a response. He also wrote several more letters to

these people, which were unanswered. He made repeated attempts to contact them by telephone and tried to see them in his office. The people broke numerous appointments to meet with Kinser and were uncooperative. Kinser then spoke to Shirley Steele, an attorney from Des Moines, Iowa. Ms. Steele had interviewed the people in Iowa and found them to be suspect. She stated that she believed they would lie on the witness stand. In the middle of the trial, some of these people appeared in Urbana. They acted antagonistically towards Kinser. Bernice Lewis, the defendant's sister who was being tried with the defendant, told her attorney that she did not want these people to testify on her behalf. Kinser then discussed with the defendant the possibility of their testifying. The defendant agreed with Kinser that these people should not testify.

In this case, where the alleged incompetence is based on a claim that counsel failed to investigate and present certain alibi witnesses, persons who were totally uncooperative, suspect and antagonistic, the tactical decision not to have them testify was reasonable and could have been in the defendant's best interest. Impeachable evidence can be more harmful than an absence of evidence. Under these circumstances, Kinser's decision not to call these people as witnesses could have been an example of wise defense tactics. As discussed in *Lewis I*, we do not believe the defendant was prejudiced by this decision and we do not believe presentation of this evidence would have changed the outcome. This evidence, as the circuit court noted, "would have probably destroyed any slim chance the petitioner [defendant] then had."

The defendant, for the first time, asserts that he was denied effective assistance of counsel at the sentencing phase of his trial because of Kinser's alleged failure to investigate possible mitigating factors and to present his social history. First, it should be noted that failure to offer evidence in mitigation does not in and of itself demonstrate

incompetence. (*People v. Kubat* (1983), 94 Ill. 2d 437, 488.) In this case, we believe Kinser reasonably concluded that there was nothing to be presented in mitigation that could not possibly backfire and cause harm to the defendant's case. Kinser decided instead to give a strong closing argument based on a plea for mercy and based on the fact that the defendant had acted under the threat of the victim's apparent reaching for a weapon. This strategic decision does not demonstrate incompetence, given the particular circumstances of this case.

The defendant asserts that evidence should have been presented to show that he had a daughter. Specifically he believed a letter his daughter wrote to him should have been introduced for mitigation purposes. Besides the fact that the defendant's daughter was illegitimate, a fact which Kinser believed might have been looked upon unfavorably by the jury, the defendant had represented that he did not have children on his affidavit of assets and liabilities. This contradictory evidence may have hurt defendant's case. Therefore, we do not believe that the failure to present this evidence prejudiced the defendant or would have changed the outcome.

Although defendant did not specifically raise Kinser's failure to present the hair-sample-analysis evidence in the ineffective-assistance-of-counsel section of his brief before this court, since we have concluded that the report was not material and since Kinser testified that the report was inconclusive, his failure to present this evidence did not prejudice the defendant and would not have changed the outcome of the trial.

Supreme Court Rule 341(e)(7) provides that points not argued in the appellant's brief are waived and shall not be raised in oral argument. (87 Ill. 2d R. 341(e)(7).) Prior to the oral arguments in this appeal, the defendant had not raised the issue of whether Kinser was ineffective because he stipulated to the defendant's "rap" sheet (which listed

the defendant's three prior felony convictions) without having the State prove that there were no uncounseled guilty pleas among those convictions. In so doing, the defendant has unfairly prejudiced the State by failing to provide the State with an opportunity to address this point. We also note that the defendant has failed to show that he was actually prejudiced by Kinser's stipulation.

Considering the entire record of this case, including the evidence that was presented at the hearing on the post-conviction petition, the allegations of ineffective assistance, whether standing separately or cumulatively, do not demonstrate any incompetence on the part of the defendant's attorney. Kinser worked hard to provide the defendant with the best possible defense, and nothing he did resulted in prejudice to the defendant or would have changed the outcome of this case.

## CONSTITUTIONALITY OF THE ILLINOIS DEATH PENALTY ACT

At the post-conviction hearing, the defendant submitted that the Act, as applied, denied him equal protection of the law for these reasons: (1) it was racially discriminatory; (2) it was arbitrarily imposed upon differing prosecution standards; and (3) it was disproportionately applied in murder/armed-robbery cases. In response to these assertions, the State contends, in part, that the principles of *res judicata* and waiver mandate a dismissal of the defendant's aforementioned claims.

As to the State's contentions, this court has often held that " 'where a person convicted of a crime has taken an appeal from the judgment of conviction on a complete record, the judgment of the reviewing court is *res judicata* as to all issues actually decided by the court and all issues which could have been presented to the reviewing court, if not presented, are waived.' " (*People v. Beckham* (1970), 46 Ill. 2d 569, 571; *People v. Kamsler* (1968), 39 Ill. 2d 73, 74;

*People v. Armes* (1967), 37 Ill. 2d 457.) However, in numerous cases we have also held that *res judicata* cannot be mechanically applied to foreclose an inquiry which probes beneath the mere fact of adjudication to determine whether or not, in the process of adjudication, there has been any infringement of the constitutional rights of the defendant. (*People v. Keagle* (1967), 37 Ill. 2d 96, 101; *People v. Reeves* (1952), 412 Ill. 555, 559; *People v. Evans* (1952), 412 Ill. 616, 620.) Similarly, we have held that the doctrine of waiver is relaxed "where fundamental fairness so requires." (*People v. Williams* (1966), 36 Ill. 2d 194; *People v. Hamby* (1965), 32 Ill. 2d 291, 294.) However, this court does not have to address the issue of whether the doctrines of *res judicata* and waiver apply, because the Act as applied to the merits of this case did not deny the defendant equal protection of the law.

In support of the aforementioned issues, the defendant offered "A Compilation and Comparison of Statistics Concerning Application of the 1977 Illinois Death Penalty and Murder Statute in Felony Murder Cases" (the compilation). The parties stipulated to the fact that the data contained in the compilation were taken from the offices of various county clerks. Dr. John Koval testified for the State concerning this data. The parties stipulated to the fact that Dr. Koval was an associate professor of sociology at DePaul University in Chicago and was qualified to testify as an expert in the area of research methodology and statistics as to the compilation. Dr. Koval testified that the sample size used in the compilation was so small as to make any conclusions suspect, and that there was not enough information about individual cases, individual defendants, or the design of the study in order to answer the questions presumably raised. He stated that the data measurement was insufficient, which made the entire study questionable if not, in fact, invalid. Dr. Koval's analysis was the *only* expert testimony offered as to the compila-

tion.

Dr. Koval concluded that there was no evidence in the compilation that the statute had a disparate impact on minorities. Based on the survey, Dr. Koval stated that if there were racial disparateness, such disparateness was prejudicial to whites and favorable to blacks. However, Dr. Koval stated that the most conservative conclusion he could draw was that no racial disparateness existed. Even when the race of the victim was compared with the race of the defendant, Dr. Koval concluded racial disparateness was not present.

As to the defendant's allegation that the statute has been arbitrarily applied by Illinois prosecutors, Dr. Koval noted that the compilation made no conclusions whatsoever regarding the claim. He also stated that the data base in the survey was too inadequate to draw any conclusions on his own.

In addition, this court stated in *Lewis I* that a prosecutor cannot arbitrarily impose the death penalty. (88 Ill. 2d 129, 149.) In further explanation of this view, Justice Moran in his concurring opinion stated:

> "It is not [in] every case of murder that a prosecutor may seek the death penalty. He may do so only when one or more of the seven aggravating factors listed under section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)) is present. It is my view that these seven aggravating factors constitute objective standards under which the prosecutor may *seek* the death penalty. It is totally inaccurate to refer to the prosecutor as the one who *imposes* the sentence. It is the sentencing body—judge or jury, as the case may be— that imposes the sentence. The prosecutor only triggers the procedure to be followed and then only when the evidence establishes that one or more of the aggravating factors is present." 88 Ill. 2d 128, 172 (Moran, J., concurring). See also *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531.

As for the type of proportionality review sought by the

defendant the Supreme Court has stated that the appropriate inquiry when analyzing a State appellate review procedure is whether that process "serves as a check against the random or arbitrary imposition of the death penalty." (*Gregg v. Georgia* (1976), 428 U.S. 153, 206, 49 L. Ed. 2d 859, 893, 96 S. Ct. 2909, 2940.) Prompt judicial review afforded by a court with statewide jurisdiction provides "a means to promote the evenhanded, rational and consistent imposition of death sentences." *Jurek v. Texas* (1976), 428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958; see also *Proffitt v. Florida* (1976), 428 U.S. 242, 258-59, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969-70.

In *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871, *reversing* (9th Cir. 1982), 692 F.2d 1189, along with many other challenges to the conviction and sentence, Harris claimed on appeal that the California capital punishment statute was invalid under the United States Constitution. The statute required the jury to find at least one special circumstance beyond a reasonable doubt, allowed for the introduction of aggravating and mitigating evidence at the sentencing hearing, and provided for an automatic appeal. The Supreme Court declared that comparative proportionality review on appeal was not required in every case under the United States Constitution and that the California statute fully complied with the Federal guidelines.

The defendant's argument for proportionality review must also fail. The Illinois Constitution (Ill. Const. 1970, art. IV, sec. 4(b)), the death penalty statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i)), and Supreme Court Rule 603 (87 Ill. 2d R. 603) all provide for direct appeal to this court of any conviction for which the death penalty has been imposed. The entire court record is available to the reviewing court for examination (87 Ill. 2d R. 342(d)), thus disclosing the evidence which motivated the imposition of the death sentence. This court has consistently found that these re-

view procedures sufficiently protect against the arbitrary imposition of capital punishment. *People v. Williams* (1983), 97 Ill. 2d 252; *People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44.

Dr. Koval, in specifically addressing the issue of whether the compilation demonstrated that the statute was disproportionately applied in murder/armed-robbery cases, stated that there were "no conclusions in the study to support this and no data to back it up." As found by the circuit court, there is no evidence in support of the allegations that the statute denied the defendant equal protection of the law.

Since we have held that this court properly transferred this appeal from the appellate court to this court, that there was no violation of *Brady*, that the defendant was not denied effective assistance of counsel, or denied equal protection, we affirm the judgment of the circuit court of Champaign County denying post-conviction relief to the defendant. The clerk of this court is directed to enter an order fixing Tuesday, May 14, 1985, as the date on which the sentence of death entered in the circuit court is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE CLARK, dissenting:

In *People v. Lewis* (1981), 88 Ill. 2d 129, I joined with the majority of this court in affirming the defendant's conviction and sentence. However, in light of facts which were brought out in the post-conviction hearing and during oral

argument, I am compelled to dissent from them now.

In defendant's direct appeal to this court, he raised the issue of ineffective assistance of counsel. He again raised this issue in his petition for post-conviction relief, as well as in his present appeal. Although the defendant has raised points similar to those he raised in *Lewis I* in this post-conviction appeal, he raised additional points as well. I have also *sua sponte* raised points on this issue. I believe that when all of the individual points which have been raised on this issue are added together, the only conclusion that can be reached is that defendant's trial counsel, Kenneth Kinser, was ineffective.

The American system of justice is an adversarial system. We use this system because we believe it leads to fair and just results. In a long line of cases, the Supreme Court has recognized that the sixth amendment right to counsel is an integral part of our adversarial system. See *Powell v. Alabama* (1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55; *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1161, 58 S. Ct. 1019; and *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792.

In *Gideon,* the court recognized the importance of counsel's assistance, holding that the sixth amendment right to counsel applies to all State felony prosecutions and that the defendant has the right to appointed counsel if he is unable to retain counsel. 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792.

The Supreme Court has also recognized that the mere presence of counsel at trial is not enough. "[T]he right to counsel is the right to the effective assistance of counsel." (*McMann v. Richardson* (1970), 397 U.S. 759, 771, n.14, 25 L. Ed. 2d 763, 773 n.14, 90 S. Ct. 1441, 1449 n.14.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland*

*v. Washington* (1984), 466 U.S. \_\_\_, \_\_\_, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064.) The proper standard for counsel's performance is "that of reasonably effective assistance." (466 U.S. \_\_\_, \_\_\_, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) The criminal attorney's performance must therefore be " 'within the range of competence demanded of attorneys in criminal cases.' " *McMann v. Richardson* (1970), 397 U. S. 759, 25 L. Ed. 2d 763, 90 S. Ct. 1441, quoted in *Strickland v. Washington* (1984), 466 U.S. \_\_\_, \_\_\_, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2065.

In *Strickland,* the court set forth the two-part test which a defendant claiming ineffective assistance of counsel must meet to have his conviction and/or death sentence reversed. This court adopted the *Strickland* test in *People v. Albanese* (1984), 104 Ill. 2d 504. To reverse the defendant's conviction and/or death sentence in this case, the defendant had to establish that: (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." 466 U.S. \_\_\_, \_\_\_, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064. I believe the defendant established both requirements.

I will first set forth all the points which the defendant raised in *Lewis I*. I will then discuss the points the defendant raised in this appeal, and lastly the points which I raise *sua sponte*. I will then analyze these points using the *Strickland* two-part test.

In *Lewis I,* the defendant raised the following points with regard to the issue of ineffective assistance of counsel: (1) Kinser failed to make a motion *in limine* to prevent the use of defendant's prior convictions if the defendant testified; (2) Kinser failed to ask that the race of the jurors be noted; (3) Kinser failed to object to the leading questions asked of Maurice Farris during the direct examination of Farris; (4) Kinser failed to couple his motion for a mistrial with a motion for severance from Willie T. Sang-

ster's trial; (5) Kinser failed to object to inaccuracies in the prosecutor's closing argument and Scott Diamond's closing statement which implied that the defendant was guilty; (6) Kinser and the defendant failed to communicate adequately; and (7) Kinser waived the opening statement. In *Lewis I*, this court concluded that Kinser's representation of the defendant, when "[v]iewed in the context of an ongoing trial," was not ineffective. (88 Ill. 2d 129, 159.) Today, the court has reached the same conclusion. However, I cannot join in this erroneous conclusion.

In the defendant's post-conviction appeal, he argued that the post-conviction record showed that "Mr. Kinser's age, experience, background and personal make-up rendered him completely unequipped to act as a conscientious and zealous advocate" on defendant's behalf. Kinser testified that he had kept abreast of changes in the criminal law by reading legal publications and attending seminars. He also testified that he had been retained in at least 50 felony cases. However, Kinser indicated at the post-conviction hearing that around 1975 he decided to curtail his criminal practice. It must be noted that at the time of the trial, spring 1979, Kinser was a sole practitioner and that the primary emphasis of his practice was real estate, probate and trust law.

A second point raised in the defendant's post-conviction appeal was that Kinser failed to properly handle a motion for a mistrial. This issue was raised in the defendant's direct appeal; however, new facts came to light at the post-conviction hearing. At the trial, an FBI agent testified that he had seen the defendant with the defendant's probation officer. This testimony alerted the jury that the defendant had a prior criminal record.

Testimony at the post-conviction hearing established that Kinser objected to the FBI agent's testimony only after Scott Diamond, Bernice Lewis' attorney, instructed Kinser to object. In addition, when Diamond and Kinser

approached the bench, Diamond had to tell Kinser to move for a mistrial, which Kinser did. Kinser later withdrew this motion, even though the trial judge indicated that the motion would be granted.

A third point raised by defendant in this post-conviction appeal was that Kinser failed to have a third party present during his interview with Maurice Farris. Therefore, Kinser was unable to impeach Farris' testimony at trial.

The defendant further alleged that Kinser failed to investigate the defendant's background and the facts of the case, to discover mitigating factors which could have been beneficial to the defendant in the sentencing phase of the trial. The defendant cited the following omissions by Kinser: (1) failure to talk to friends, past employers, and some family members; (2) failure to investigate defendant's prior criminal record; (3) failure to interview eyewitnesses to the murder and robbery; and (4) failure to have the State produce certified transcripts of the defendant's prior convictions.

Another point which the defendant argued for the first time in this appeal was that Kinser failed to investigate an alibi defense. The defendant gave Kinser the names of potential alibi witnesses in Des Moines, Iowa. Kinser wrote to these individuals but received little response. On several occasions, the potential alibi witnesses broke appointments to meet with Kinser. Diamond had contacted Shirley Steele, an attorney from Des Moines, Iowa, to contact alibi witnesses on Bernice's behalf. Steele interviewed the potential witnesses regarding Bernice's whereabouts on the dates in question and found the potential witnesses to be suspect. Steele did not question these potential witnesses with respect to an alibi defense for Cornelius. Yet, Kinser relied on Steele's opinion that the witnesses could not provide an alibi defense for Cornelius.

Five potential alibi witnesses attended the defendant's trial. Yet, Kinser failed to interview them or call them as

witnesses. By failing to interview and call these potential witnesses, Kinser prevented the jury from determining their veracity.

I now turn to points which I raise *sua sponte* on the issue of ineffective assistance of counsel. In addition to failing to investigate or call the potential alibi witnesses, Kinser failed to investigate what type of testimony Bernice Joyners might have provided. During a conversation outside the presence of the jury, the defendant told the court that Bernice Joyners, if called, would have testified that she saw Maurice Farris alone in downtown Decatur the morning before the robbery. However, Farris testified that, at this very time, he was with Cornelius and Bernice Lewis in downtown Decatur.

Another witness Kinser failed to call was FBI agent Burwitz. During the police investigation of this case, two negroid hairs suitable for analysis were found. One was found in a ski mask used in the robbery, and the other was found in the back-seat area of the maroon Monte Carlo automobile which was used in the robbery. These two hair samples were compared with hair standards obtained from Cornelius Lewis, Bernice Lewis, and Maurice Farris, three of the people charged with the robbery. All three were black. The FBI compared these standards with the hair samples found in the ski mask and the car and excluded the Lewises as the source. Because of a verbal report, Kinser knew that Agent Burwitz would have testified that Cornelius had been excluded as the source of the negroid hair found in the ski mask and the car.

Besides failing to call Agent Burwitz, at a pretrial hearing motion on May 8, 1979, the trial court became aware that the prosecutor and defense attorneys were waiting for FBI reports, presumably the hair-analysis reports. The judge stated: "*** I'm confident that you'll have it before certainly the time comes if you would want to put it on, to present it. If not, for whatever reason it's not available at

that time, *I'm prepared to grant whatever relief might be required to see to it that it is made available so you can have that evidence.*" (Emphasis added.) Kinser never requested any relief. He did not tell the judge if he had received the reports, and if he did receive the reports, he did not request time to examine them.

In addition, in his testimony at the post-conviction hearing Kinser stated that he planned to create confusion as to whom the "perpetrator was." However, his cross-examinations of the eyewitnesses failed to create any doubt as to whom the gunman could have been. It was clear from the testimony of the eyewitnesses at the trial that the gunman was the taller of the two robbers. At trial there was also testimony as to the heights of Cornelius Lewis, Bernice Lewis, and Maurice Farris. An FBI agent testified that Cornelius Lewis told the agent that he was 6 feet 2 inches tall. Farris testified that he was 5 feet 8 inches tall, that Bernice Lewis was 5 feet 10 inches or 5 feet 11 inches tall, and that Cornelius Lewis was at least 6 feet tall. Clearly Cornelius was the tallest of the three.

The eyewitness also testified that the robbers were two men. At trial Maurice Farris testified that when he first met Bernice Lewis he thought she was a man. Testimony at the post-conviction hearing revealed that Bernice was extremely flat chested and could easily be taken for a man. In addition, Diamond testified at the post-conviction hearing that he was not convinced that Bernice was not the gunman.

Even though Kinser's apparent theory was to create confusion as to who the gunman was, he never developed his cross-examination of the eyewitnesses to cause the eyewitnesses to doubt who the gunman was. Of the five eyewitnesses, Kinser only cross-examined four. He never asked these four if they had ever seen a woman who resembled a man or if the gunman could have been a flat-chested woman. If Kinser had developed a cross-examina-

tion along these lines, he could have argued that it might have been Bernice and Farris who were the two robbers. Therefore, Bernice, the taller of these two, would have been the gunman.

Besides failing to attempt to use the height and build of the robbers compared to the height and build of the defendants to create doubt in the minds of the jurors, Kinser failed to use the results of the hair-analysis tests on Maurice Farris' hair standard to aid Kinser's theory. The hair-analysis report of Farris' hair standard excluded Farris as the source of the hair found in the ski mask, but was inconclusive as to Farris being the source of the hair found in the back seat of the car. Although there was some question as to whether Kinser received this report, at the post-conviction hearing he testified that he had a "faint recollection" of seeing it. As noted earlier, Cornelius had been excluded as the source of the hair found in the car. Farris testified, however, that he drove the car; yet he had not been excluded as the source of the hair found in the back seat. By using this evidence, Kinser could have created doubt as to whether Farris was the driver or one of the robbers.

The final point regarding the ineffective-assistance-of-counsel issue was that Kinser was ineffective during the sentencing phase of the trial when he stipulated to a "rap sheet," thereby failing to make the State prove that none of these convictions were from uncounseled guilty pleas. The "rap sheet" contained the defendant's prior felony convictions, namely, felonious assaults with a knife and firearm; (2) second degree robbery; and (3) bank robbery. If any or all of these convictions were a result of an uncounseled guilty plea, the conviction(s) would have been inadmissible and therefore not presented to the jury. It can be presumed that if the jurors were never told (*i.e.*, of the bank robbery) they might have been less inclined to sentence the defendant to death. The question of whether

these convictions resulted from uncounseled guilty pleas, without a knowing waiver, goes to Kinser's ineffectiveness as counsel. This point was raised for the first time during oral argument. According to Supreme Court Rule 341(e)(7) (87 Ill. 2d 341(e)(7)), points not argued in the appellant's brief are waived and shall not be raised in oral argument. However, in *Hux v. Raben* (1967), 38 Ill. 2d 223, 224-25, this court held:

> "The last sentence of [the rule] *** states an admonition to the parties, not a limitation upon the jurisdiction of the reviewing court. The distinction clearly appears when that sentence is read in conjunction with Rule 366, which deals with the powers of a reviewing court and the scope of review. Rule 366 provides: '(a) *Powers.* In all appeals the reviewing court may, in its discretion, and on such terms as it deems just *** (5) give any judgment and make any order that ought to have been given or made, ***.' (36 Ill. 2d 159.) A similar thought is expressed in the provision of Rule 615 with respect to the review of criminal cases: 'Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' 36 Ill. 2d 182.
>
> These provisions recognize that the responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of waiver that stem from the adversary character of our system."

In view of the fact that the defendant's life is at stake, I feel the majority should have overridden the consideration of waiver and should have considered the point raised by the defendant in oral argument.

*Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792, established the rule that the right to counsel guaranteed by the sixth amendment was applicable to the States by virtue of the fourteenth amendment, making it unconstitutional to try a defendant for a felony in a State court unless that defendant had counsel or validly

waived counsel. Presuming waiver of counsel from a silent record is impermissible. (*Carnley v. Cochran* (1962), 369 U.S. 506, 8 L. Ed. 2d 70, 82 S. Ct. 884.) In this case, because of Kinser's stipulation to the "rap sheet," the record is silent as to whether the prior convictions were uncounseled and whether any were guilty pleas. An uncounseled guilty plea cannot be used for any purpose. (See *Burgett v. Texas* (1967), 389 U.S. 109, 19 L. Ed. 2d 319, 88 S. Ct. 258.) Since the possible defect in the prior conviction could have been denial of the right to counsel, the defendant in effect suffers anew from the deprivation of his sixth amendment rights. See *Burgett v. Texas* (1967), 389 U.S. 109, 19 L. Ed. 2d 319, 88 S. Ct. 258.

As stated earlier, the defendant had to establish that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984), 466 U.S. ___, ___, 80 L. Ed 2d 674, 693, 104 S. Ct. 2052, 2064.) Unless the defendant established both elements, it could not be said that the conviction and/or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. I believe that such a breakdown occurred.

With respect to the performance element of the *Strickland* test, it must be determined whether the aforementioned acts and/or omissions of Kinser "were outside the wide range of professionally competent assistance." (466 U.S. ___, ___, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066.) For this part of the test, information which came to the court's attention in defendant's post-conviction hearing can be relied on. (466 U.S. ___, ___, 80 L. Ed. 2d 674, 701, 104 S. Ct. 2052, 2071.) With respect to the performance element, the record shows that Kinser: failed to make a motion *in limine* to keep defendant's prior convictions out of evidence if Cornelius would have testified; failed to note the race of the jurors; failed to object to the leading questions asked of Farris during the direct examination of

Farris; failed to couple his motion for a mistrial with a motion for severance from Willie T. Sangster's trial; failed to object to inaccuracies in the prosecutor's closing argument and Scott Diamond's closing statement which implied that the defendant was guilty; failed to communicate adequately with the defendant; waived the opening statement; failed to have a third party present during his interview with Farris, thereby making it impossible to impeach Farris at trial; failed to investigate the defendant's background for the sentencing stage of the trial; failed to interview important witnesses (*i.e.*, eyewitnesses); failed to investigate an alibi defense; failed to develop his theory of the case (*i.e.*, Kinser did not attempt to create doubt as to who was involved in the robbery and murder through cross-examination of eyewitnesses and the use of the test results on Cornelius' and Farris' hair standards); failed to notify the court that he either received the FBI reports or did not receive the reports; failed to request additional time to study the FBI reports if he received them; and lastly, failed to make the State prove that the defendant's prior convictions were not uncounseled guilty pleas.

After adding all these points together, I believe that Kinser failed to perform in the manner in which an effective criminal defense attorney would have performed.

With respect to the prejudice element of the *Strickland* test (this standard was not used in *Lewis I*), the defendant raised in *Lewis I* the following points, namely: (1) Kinser's failure to object to inaccuracies in the prosecutor's closing argument and (2) Kinser's failure to properly handle the motion for a mistrial. The defendant, in his present appeal, raised the point of prejudice regarding Kinser's stipulation to the "rap sheet." In view of these three points, I believe that Kinser's deficient performance prejudiced Cornelius Lewis' defense.

When adjudicating a claim of actual ineffectiveness, it is important to note that the principles which I have stated

do not establish mechanical/mathematical rules. In every case a court should be concerned with whether the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the finder of fact would have had a reasonable doubt with regard to guilt. (*Strickland v. Washington* (1984), 466 U.S. ___, ___, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2069.) When a defendant challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer (including a reviewing court, to the extent that it independently reweighs the evidence) would have concluded that the balance of aggravating and mitigating circumstances did not sanction death. 466 U.S. ___, ___, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2069.

In this case, I believe that there was a reasonable probability that, had Kinser's errors not occurred, the jury would have had a reasonable doubt with respect to the defendant's guilt. I also believe that, absent those errors, there was a reasonable probability that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Consequently, I would have reversed the defendant's conviction and sentence and remanded his case for a new trial. For the aforementioned reasons, I dissent.

JUSTICE SIMON joins in this dissent.

JUSTICE SIMON, also dissenting:

In addition to the views expressed by Justice Clark in his dissenting opinion, which I join, I refrain from joining the majority because this post-conviction hearing was heard on direct appeal from the circuit court in violation of

Rule 651 (87 Ill. 2d R. 651(a)) and because the Illinois death penalty statute (Ill. Rev. Stat 1983, ch. 38, par. 9—1 *et seq.*) is unconstitutional.

Rule 651 (87 Ill. 2d R. 651(a)) directs that appeals from "a final judgment of the circuit court" move to the appellate court. The majority substitutes for this unambiguous command the requirements found in Rule 603 which deal with appeals from the imposition of the death penalty. (87 Ill. 2d R. 603.) Rule 603, though, which is constitutionally mandated (Ill. Const. 1970, art. VI, sec. 4), applies only to appeals from decisions which initially impose the death sentence by requiring that the imposition of a death sentence must be directly appealed to this court. A post-conviction hearing, on the other hand, only reviews a final judgment which may or may not have imposed the death sentence; the post-conviction hearing does not, of itself, impose a death sentence. The majority's reliance on Rule 603 is misplaced; Rule 651 applies to appeals from judgments denying post-conviction relief. I would require appeals from post-conviction hearings to be heard by the appellate court before any appeal could be heard by this court. The *ad hoc* application of Rule 651 in which this court has engaged by exempting appeals from post-conviction judgments in cases where a death sentence was previously imposed constitutes a violation of the equal protection clauses of the United States and Illinois constitutions (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, sec. 2) by treating defendants in such cases differently than all other defendants without any constitutional sanction for the difference in treatment.

A fear is expressed in the majority opinion that uniform results in death cases would not result without direct appeal to this court (105 Ill. 2d at 231-32). This concern seems no greater in this area of the law than in any other. Without a constitutional or legislative directive, I see no reason to resolve conflicts in our circuit or appellate courts where death sentences are being reviewed any differently

than we do in any other area of the law. Uniformity could be easily achieved by accepting for review all post-conviction appellate court decisions of cases where death sentences had been imposed at trial. The advantage to this procedure is obvious. In this difficult and painful area, the more minds reviewing the procedures employed by our circuit courts, the more certain we can be about the correctness, fairness and justice of decisions to impose this most final of penalties.

Finally, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and *People v. Albanese* (1984), 104 Ill. 2d 504 (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional, and, therefore, a death sentence should not be imposed on this defendant.