(No. 63915

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAYMOND LEE STEWART, Appellant.

*Opinion filed February 11, 1988.—Rehearing denied April 5, 1988.*

SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Peter L. Rotskoff, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Mark L. Rotert and David E. Bindi, Assistant Attorneys General,

all of Chicago, of counsel), for the People.

CHIEF JUSTICE MORAN delivered the opinion of the court:

In cause No. 56629, defendant, Raymond Lee Stewart, was convicted of the murder of Kevin Kaiser (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(3)), following a jury trial in the circuit court of Winnebago County. At a separate sentencing hearing, the same jury determined that the necessary aggravating factors existed and that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The court thereupon sentenced defendant to death and, following a direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 87 Ill. 2d R. 603), his conviction and sentence were affirmed. (*People v. Stewart* (1984), 104 Ill. 2d 463 (hereinafter referred to as *Stewart* I).) This court denied rehearing, and the United States Supreme Court denied defendant's petition for *certiorari. Stewart v. Illinois* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368.

In cause No. 56332, defendant was indicted in the circuit court of Winnebago County for the murders of Willie Fredd and Albert Pearson (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)). A jury found defendant guilty of both offenses, and following a separate sentencing hearing held before the same jury, he was sentenced to death. This court affirmed his conviction and sentence on direct appeal (*People v. Stewart* (1984), 105 Ill. 2d 22 (hereinafter referred to as *Stewart* II)), and denied his petition for rehearing. The United States Supreme Court subsequently denied his petition for *certiorari. Stewart v. Illinois* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666.

Defendant then filed a petition in each case under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1983, ch. 38,

par. 122—1 *et seq.*). Because the petitions raised the same constitutional issues, they were consolidated pursuant to the State's motion.

Defendant maintained in his petitions that the statutory grant of discretion to prosecutors has resulted in "uneven, arbitrary, and capricious application" of the death penalty statute in violation of his right to due process and his right to freedom from cruel and unusual punishment. (U.S. Const., amends. V, VIII; Ill. Const. 1970, art. I, §2.) Defendant also asserted that the alleged "racially discriminatory application" of the death penalty statute deprived him of his rights to due process and equal protection of the law. (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, §2.) Further, defendant claimed that because four of the seven presently sitting Illinois Supreme Court justices at one time allegedly believed that the death penalty statute is unconstitutional, his death sentence violates the supremacy clause of the United States Constitution and is violative of his rights to due process and freedom from cruel and unusual punishment. (U.S. Const., amends. V, XIII; Ill. Const. 1970, art. 1, §2.) Finally, defendant alleged that execution by lethal injection is violative of the prohibition against cruel and unusual punishment because no guidelines have purportedly been established regarding the "method and manner" of such executions, and because the Food and Drug Administration had not approved "the procedures to be followed or the drugs to be administered." U.S. Const., amend. VIII.

In a motion to dismiss the petitions, the State asserted that the issues raised by defendant were barred by the application of the doctrines of waiver and *res judicata*, or were insufficient to establish any constitutional violations.

Following a hearing on the petitions, the trial court granted the State's motion to dismiss the petitions with-

out an evidentiary hearing on the grounds that the issues raised were waived, barred by the application of *res judicata*, or insufficient to state a constitutional violation. Defendant brings a direct appeal to this court from the denial of his petitions. 107 Ill. 2d R. 651(a).

Review of the petitions for post-conviction relief, in this court, raises three issues: (1) Was defendant's right to the effective assistance of counsel violated during the post-conviction proceedings? (2) Did the trial court err in dismissing defendant's petitions without holding an evidentiary hearing on the allegations regarding prosecutorial discretion and the alleged racially discriminatory application of the death penalty statute? and (3) Did the alleged lack of guidelines relating to the "method and manner" of execution by lethal injection violate the eighth amendment to the United States Constitution? Defendant, in this court, has not raised the dismissal of his claim that his death sentence should be vacated because a majority of this court presently sitting, at one time, allegedly believed that the death penalty statute is unconstitutional.

The facts relating to the underlying crimes for which defendant was convicted will not be set forth in their entirety since defendant does not contend that the evidence was insufficient to support his convictions, and does not raise any issue challenging the validity of those convictions. Rather, the pertinent facts will be discussed only to the extent necessary for resolution of the issues. Moreover, "it is well established that a post-conviction proceeding is not one wherein a defendant's guilt or innocence is determined, but a new proceeding meant to delve into the constitutional phases of the original conviction which have not previously been determined." *People v. Gaines* (1984), 105 Ill. 2d 79, 87.

Defendant initially claims that he did not receive adequate representation during the post-conviction proceed-

ings because his counsel, Mr. Pumilia, failed to comply with Supreme Court Rule 651(c), which governs appeals in post-conviction proceedings. Rule 651 provides, in relevant part:

"(c) *** The record filed in [the trial] court shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney has consulted with petitioner either by mail or in person to ascertain his contentions of deprivation of constitutional right, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." 107 Ill. 2d R. 651(c).

Mr. Pumilia failed to file with the trial court a certificate of compliance with Rule 651. However, while the case was being briefed in this court, we granted the State leave to supplement the record with Mr. Pumilia's affidavit attesting to the fact that he conferred with defendant relative to the issues "which should be presented" in the post-conviction petitions. The affidavit also reflected that Ms. Kyle Wesendorf, who represented defendant on direct appeal to this court in *Stewart* II, conferred with defendant "and [Mr. Pumilia] concerning the Post Conviction Relief Petition and assisted [him] in all phases of the matter except those involving court appearances."

At the time defendant filed his reply brief, he moved this court to allow him to supplement the record with his own affidavit and the affidavit of Kyle Wesendorf, in support of his claim that Mr. Pumilia violated Rule 651(c). By order dated July 28, 1987, after the case had been fully briefed, this court granted defendant's motion to supplement the record and for a summary remand directing the trial court to conduct a hearing "on the evidentiary dispute concerning whether [Mr. Pumilia] complied with Rule 651(c)."

During the hearing on summary remand, Kyle Wesendorf testified on behalf of the defendant. She stated that she was previously employed by the State Appellate Defender's office and represented defendant on direct appeal to this court from one of his murder convictions. Ms. Wesendorf further testified that, following this court's affirmance of defendant's conviction and death sentence, she contacted Mr. Pumilia by letter to advise him that she would no longer be handling defendant's case, but that she intended to draft a "bare bones" petition for post-conviction relief on defendant's behalf which he could file. She stated that she subsequently forwarded to Mr. Pumilia a copy of the petition along with supporting documents. She did not send defendant a copy of the petition, but she spoke with him by telephone and "probably" informed him that a petition would be filed and to confer with Mr. Pumilia regarding the petition.

On cross-examination, Ms. Wesendorf testified that she also had a telephone conversation with Mr. Pumilia during which she described the post-conviction materials that she was forwarding to him. On redirect examination, she stated that the issues raised in the petition she drafted were those which could be raised in any death penalty case, and did not address any matters relating to defendant's trial proceedings. She also stated, as she did in her affidavit, that she did not discuss with Mr. Pumilia any issues that should be raised in the petition.

Defendant refused to testify at the hearing because the trial court denied his request to appear without shackles or, in the alternative, to have the public removed from the courtroom. However, defense counsel made an offer of proof which the court accepted, relating that defendant would have testified that he never placed a telephone call to Mr. Pumilia between November of 1985, when the petitions were filed, and June of

1986, when the trial court dismissed the petitions. He would also testify that, according to prison regulations, inmates may only place collect telephone calls. Finally, the offer of proof reflected that defendant was unaware that Mr. Pumilia represented him until he received a letter from him advising defendant that the petition was dismissed and an appeal would be filed.

In defendant's affidavit, which he submitted as part of the supplemental record, he also stated that he did not consult with Mr. Pumilia regarding the post-conviction petition. However, he did attest that he conferred with Mr. Pumilia regarding a "personal matter" during the pendency of the post-conviction proceedings. He also stated that Ms. Wesendorf "did discuss the procedural aspects of post-conviction proceedings" with him.

Angela Pappas, an employee of the public defender's office for Winnebago County, testified that she reviewed telephone records reflecting calls made to the public defender's office between November of 1985 and June of 1986. She stated that the records reflected that no collect calls were made to the office from Pontiac Correctional Center, wherein the defendant was confined during that time.

Mr. Pumilia was called as a witness on behalf of the State. He testified that he was the public defender for Winnebago County and that he had held that position for approximately four through five years. He stated that he was familiar with the trial records in both *Stewart* I and *Stewart* II because he represented defendant in those cases and reviewed the transcripts.

Mr. Pumilia further testified that he maintained close contact with Ms. Wesendorf throughout defendant's appeal in the case she handled, and received from her the post-conviction petition and supporting documentation to be filed on defendant's behalf.

He also stated that during the pendency of the post-conviction proceeding, he had a "brief" telephone conversation with defendant, which the defendant initiated. He testified that during the conversation, he "briefly outlined the issues in the Petition," and advised defendant that he had no further issues to raise. He asked defendant whether there were any additional allegations which he would like to include in the petitions, and defendant's response was "negative." Finally, Mr. Pumilia testified that defendant could have telephoned him prior to November of 1985, but he believed that was "highly unlikely."

During cross-examination, Mr. Pumilia testified that the telephone call to which he attested on direct examination was his only contact with defendant during the pendency of the post-conviction proceedings in the trial court. He also stated that he was familiar with the appeals in *Stewart* I and *Stewart* II and read the Illinois Supreme Court opinions in those cases. Mr. Pumilia further testified that he realized he was required to confer with his client and review the reports of proceedings in accordance with Rule 651(c). He stated that he "went over the whole batch" of transcripts at some point, and reviewed certain portions following his appointment as defendant's post-conviction counsel.

Finally, Mr. Pumilia stated that if a defendant wished to claim ineffective assistance of trial counsel, that same counsel should not represent him during the post-conviction proceedings without first obtaining a "waiver" from the client.

The trial court, in determining that defendant's counsel complied with Rule 651(c), found that a post-conviction petition drafted by a lawyer was filed; that defendant had the benefit of both Mr. Pumilia's and Ms. Wesendorf's thoughts concerning the petition; and that Ms. Wesendorf apparently did not consider raising any

issue regarding ineffective assistance of counsel. In addition, the trial court noted there was conflicting evidence with respect to whether defendant ever telephoned Mr. Pumilia and discussed the petition, but concluded that "Mr. Pumilia is more worthy of belief. I thought Mr. Pumilia was straightforward about what he did here in this case."

Defendant's motion for reconsideration of the trial court's ruling was denied, and he now appeals claiming that, as a matter of law, his counsel failed to comply with Rule 651(c). We disagree.

The evidence adduced at the hearing, as well as other evidence in the record, establishes that two petitions for post-conviction relief, prepared and reviewed by an attorney, were filed on behalf of defendant. Those petitions were later amended by counsel to include supporting documentation. The uncontroverted evidence also reveals that Mr. Pumilia reviewed the transcripts of proceedings from both of defendant's trials, at which he represented him, and that Ms. Wesendorf reviewed the transcripts from one of defendant's trials prior to preparing the petition.

The sole controverted question was whether Mr. Pumilia conferred with defendant concerning the post-conviction petitions. Mr. Pumilia, both at the evidentiary hearing and in his affidavit, testified that he did have such a discussion with defendant. Defendant did not testify at the hearing and claimed only through an unsworn offer of proof that he never conferred with his counsel until after the petition was filed. In his affidavit, on the other hand, he conceded that he and Mr. Pumilia conferred during the relevant time period, but claimed that the discussion concerned an unrelated "personal matter."

Thus, whether or not defendant and Mr. Pumilia conferred concerning the post-conviction petitions was a

question of fact for the trial court to resolve. (*E.g., People v. Stewart* (1984), 105 Ill. 2d 22, 66 ("It is the function of the [fact finder] to determine credibility of the witnesses"), citing *People v. Akis* (1976), 63 Ill. 2d 296, 298.) Indeed, to resolve the evidentiary dispute was the very purpose for which this court remanded the case to the trial court for a hearing. The trial court determined that Mr. Pumilia was "more worthy of belief," and " '[i]t is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact ***.' " *People v. Johnson* (1986), 114 Ill. 2d 170, 190, quoting *People v. Novotny* (1968), 41 Ill. 2d 401, 412.

Defendant does not specifically assert that we should overturn the trial court's findings. Rather, he claims that, even if Mr. Pumilia did confer with him, that telephone conversation was insufficient, as a matter of law, to satisfy the requirements of Rule 651(c). No authority has been cited by defendant for this proposition, nor are we aware of any. The rule does not specify a certain number of conversations that must take place between counsel and the defendant, nor does it mandate that counsel initiate the contact. Where, as here, it is determined that counsel advised defendant of the issues raised in the petition, and offered him an opportunity to suggest additional claims, we believe the requirement of Rule 651(c) that counsel confer with defendant concerning the petition has been satisfied.

For the first time, during oral argument before this court, defendant also claimed that he did not receive effective assistance of counsel during the post-conviction proceedings because Mr. Pumilia's representation of him during those proceedings created a conflict of interest of which he failed to apprise defendant. Apparently, defendant is asserting that he did not receive adequate repre-

sentation during his two trial proceedings, and Mr. Pumilia would have a conflict in asserting this claim in the post-conviction petitions because he was the attorney who represented defendant during his trials.

Defendant's claim that he received ineffective assistance of counsel is based on the fact that, in both *Stewart* I and *Stewart* II, this court held that he waived review of five issues because they were not raised in the trial court. He also notes that the post-conviction petitions raise general constitutional claims but do not allege any errors specific to his trial proceedings. The State argues that defendant is precluded from raising the question of ineffective assistance of counsel because he failed to assert this claim at any time prior to oral argument before this court.

"The purpose of the post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction *that have not already been adjudicated or could have been.*" (Emphasis added.) (*People v. Silagy* (1987), 116 Ill. 2d 357, 365.) Thus, "[t]he judgment of the reviewing court on a previous appeal is *res judicata* as to all issues actually decided, and any claim that could have been presented to the reviewing court in the direct appeal is, if not presented, thereafter barred under the doctrine of waiver." *Silagy*, 116 Ill. 2d at 365, citing *People v. Kubat* (1986), 114 Ill. 2d 424, 436; *People v. Jones* (1985), 109 Ill. 2d 19, 24; *People v. Gaines* (1984), 105 Ill. 2d 79, 87-88.

On defendant's direct appeal in *Stewart* I, during which he was represented by counsel other than Mr. Pumilia, he alleged that Mr. Pumilia's failure to raise certain issues in the trial court, and to tender certain objections, deprived him of the effective assistance of counsel. This court reviewed Mr. Pumilia's conduct in each of these instances, and concluded that he adequately represented defendant. On his direct appeal in *Stewart* II,

where defendant was again represented by counsel other than Mr. Pumilia, he failed to raise *any* claim that he received ineffective assistance of counsel during the trial proceedings. Thus, unless application of the doctrines of waiver and *res judicata* would be fundamentally unfair (see *People v. Gaines* (1984), 105 Ill. 2d 79, 91), defendant is precluded from raising this issue on appeal.

After a careful review of the record, we do not believe that it would be manifestly unjust to preclude review of defendant's claim. This is not a situation wherein defendant was represented by the same counsel during his trial proceedings and on his direct appeals. Moreover, he had the benefit of two attorneys' thoughts concerning the post-conviction petitions. We note parenthetically that the attorney who initially drafted one of the petitions, and reviewed the record in *Stewart* II, did not choose to raise any claim regarding Mr. Pumilia's alleged incompetency.

More significantly, defendant did not even raise this issue in his briefs filed with this court appealing the denial of his post-conviction petitions. Our Supreme Court Rule 341(e)(7) provides that points not asserted in an appellant's brief are waived and shall not be raised for the first time, as defendant did here, during oral argument. 107 Ill. 2d R. 341(e)(7); see also *People v. Lewis* (1984), 105 Ill. 2d 226, 249-50 (holding that defendant waived review of an issue which he raised for the first time during oral argument).

Nevertheless, defendant claims that Mr. Pumilia failed to inform him that he had a conflict of interest in representing him during the post-conviction proceeding, and that his new counsel was unaware of this failure until the hearing on remand, after the briefs were already filed.

This argument presupposes that Mr. Pumilia operated under a conflict of interest of which he had the duty to,

*sua sponte,* advise the defendant. However, unless defendant desired to raise an issue relating to the effectiveness of his counsel, there would, of course, be no conflict. There is no evidence in the record that defendant wished to pursue such a claim. Contrary to counsel's assertion, Mr. Pumilia did *not* testify that his representation of defendant during the post-conviction proceedings constituted a conflict of interest. He merely opined that, if a defendant wished to claim ineffective assistance of trial counsel, that counsel should obtain a waiver prior to representing the defendant in the post-conviction proceedings. Moreover, defendant does not direct our attention to any authority for his apparent proposition that counsel was required to advise him that he may have a conflict in the event defendant wished to raise some hypothetical issue.

Even more fundamentally, the alleged conflict of interest is based on the premise that defendant received ineffective assistance of counsel during the trial proceedings because Mr. Pumilia failed to preserve certain issues for review. However, this alleged ground for defendant's claim of ineffective assistance of counsel *was* known to his counsel when he appealed the denial of defendant's post-conviction petitions. Nevertheless, no such claim was made in defendant's briefs.

Accordingly, for the aforementioned reasons, we conclude that defendant is precluded from now raising the claim that he did not receive the effective assistance of counsel.

Defendant further contends that the trial court erred in dismissing, without an evidentiary hearing, his claim that the death penalty statute "is being applied in a racially discriminatory manner in violation of the United States and Illinois Constitutions." In support of his claim, defendant proffers a statistical study which purportedly evidences that a defendant accused of murder-

ing a white victim is four times more likely to receive the death penalty than a defendant accused of murdering a black victim. The study also purportedly shows that a black defendant accused of murdering a white victim is more likely to receive the death penalty than a white defendant accused of murdering a white victim. See Gross & Mauro, *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing & Homicide Victimization*, 37 Stan. L. Rev. 27 (1984) (the Gross study).

The State argues that dismissal of this claim was proper because defendant failed to raise this issue on his direct appeals. In the alternative, it is claimed that the Gross study is insufficient, as a matter of law, to establish a violation of defendant's constitutional rights.

We note initially that a published version of the Gross study was not available at the time of defendant's direct appeals in *Stewart* I and *Stewart* II, and thus it would seem fundamentally unfair to hold that he has waived any claim based on that study. In any event, however, it is now clear that defendant cannot make a substantial showing of a violation of his constitutional rights based on the Gross study.

In *People v. Davis* (1987), 119 Ill. 2d 61, decided after the briefing was completed in this case, this court was confronted with virtually the identical issue as presented here. In *Davis*, defendant claimed that the fact he was black and the victim was white increased the likelihood that he would receive the death sentence, and that this racial disparity violated his constitutional rights. The defendant in *Davis* also proffered the Gross study in support of his contention.

This court, relying on the United States Supreme Court's recent decision in *McCleskey v. Kemp* (1987), 481 U.S. 279, 95 L. Ed. 2d 262, 107 S. Ct. 1756, rejected defendant's claim, holding that "whatever the merits of

the Gross study, the defendant cannot make a substantial showing of a violation of his Federal constitutional rights." (*People v. Davis* (1987), 119 Ill. 2d 61, 66.) This court further held that the Gross study could not substantiate a claim under the Illinois Constitution. *Davis*, 119 Ill. 2d at 68.

In *McCleskey v. Kemp* (1987), 481 U.S. 279, 95 L. Ed. 2d 262, 107 S. Ct. 1756, the defendant, relying on a complex statistical study (the Baldus study), alleged that the Georgia death penalty statute is administered in a constitutionally impermissible fashion because of the likelihood that racial considerations are a factor in determining whether a particular defendant receives the death penalty. According to the Baldus study, after controlling for nonracial variables, defendants accused of murdering white victims are 4.3 times more likely to receive the death penalty than those accused of murdering blacks.

The Court, while assuming the validity of the Baldus study, concluded that it "does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital-sentencing process." (481 U.S. at 313, 95 L. Ed. 2d at 292, 107 S. Ct. at 1778.) The Court further held that "[defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose," and that "racial considerations played a part in his sentence." (Emphasis in original.) 481 U.S. at 292, 95 L. Ed. 2d at 278, 107 S. Ct. at 1766-67.

As in *Davis* and *McCleskey*, defendant made no attempt to prove that he received the death penalty because the decisionmakers in *his* case were motivated by racial bias. Moreover, in each of defendant's cases, constitutionally permissible factors clearly existed upon which the death penalty could be imposed. In *Stewart* I, defendant was convicted of intentional murder and felony murder. In *Stewart* II, defendant was convicted of

murdering two victims during the course of an armed robbery.

Accordingly, absent clear proof to the contrary, there is no basis to assume that defendant's death sentences were the product of racial bias or "wantonly and freakishly imposed." (*McCleskey*, 481 U.S. at 308, 95 L. Ed. 2d at 288, 107 S. Ct. at 1775.) The trial court thus properly dismissed defendant's claim without an evidentiary hearing. See *People v. Silagy* (1987), 116 Ill. 2d 357, 365 (a defendant is only entitled to an evidentiary hearing upon a substantial showing that his constitutional rights were violated).

As another basis for post-conviction relief, defendant alleges that the death penalty statute is unconstitutional because it leads to arbitrary and capricious application of the death penalty insofar as it allegedly delegates to prosecutors, without sufficient guidelines, the discretion to determine in which cases the death penalty will be sought. In support of his contention, defendant directs our attention to a survey and accompanying article published in the July 1985 issue of Chicago Lawyer (an independent monthly newspaper) relating to the practices of Illinois prosecutors in seeking imposition of the death penalty. Defendant has also submitted an affidavit summarizing the findings of the survey, and the written responses submitted by various prosecutors in connection with that survey.

The article and survey were based upon information received from a majority of the Illinois State's Attorneys, and purports to show that some prosecutors always seek the death penalty if a statutory aggravating factor exists, some prosecutors have never sought that penalty, and others decide whether to seek the death sentence on a case-by-case basis. The prosecutors in the latter category have not promulgated written guidelines

pertaining to the determination of whether to seek the death penalty in a given case.

The State argues that this issue is *res judicata* be-- cause this court already rejected defendant's claim that the statutory grant of discretion to the prosecutor is improper. (See *People v. Stewart* (1984), 104 Ill. 2d 463, 498-99; *People v. Stewart* (1984), 105 Ill. 2d 22, 75.) In the alternative, the State asserts that the survey is insufficient to support defendant's claim because it does not show that the prosecutors in defendant's cases sought the death penalty on the basis of constitutionally impermissible factors.

Initially, we do not agree with the State's contention that this issue was already decided adversely to defendant on his direct appeals. There, defendant was challenging the *facial validity* of the statute. In contrast, he is now claiming that the statute is invalid *as applied*, in that prosecutors are allegedly seeking the death penalty on an arbitrary, capricious and discriminatory basis. (See *McCleskey v. Kemp* (1987), 481 U.S. 279, 308, 95 L. Ed. 2d 262, 289, 107 S. Ct. 1756, 1775 (wherein the Court separately addressed defendant's claims that the capital punishment statute was both facially invalid, and that it was arbitrarily and capriciously applied).) Nevertheless, we do not believe that defendant has made a substantial showing of a constitutional violation such as to entitle him to an evidentiary hearing on this claim.

Assuming, without deciding, the validity of the survey, it simply evidences that prosecutors have exercised discretion in determining whether to seek imposition of the death penalty. For instance, the survey evidences that not every prosecutor has sought the death penalty in every case where it might statutorily be imposed.

In previously holding that the statutory grant of discretion to prosecutors is valid, this court recognized that the death penalty would not be sought in every "death-

eligible" case. Rather, the decision to seek a death sentence will depend on various factors, such as an "estimate of what testimony and other evidence will be available and its persuasive effect." *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 543.

In *McCleskey v. Kemp* (1987), 481 U.S. 279, 296, 311-12, 95 L. Ed. 2d 262, 281, 291, 107 S. Ct. 1756, 1768, 1777, the United States Supreme Court recognized the propriety of allowing prosecutors to exercise discretion in capital cases, and stated that:

> "[T]he policy considerations behind a prosecutor's traditionally 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties ***."

> "[T]he capacity of prosecutorial discretion to provide individualized justice is 'firmly entrenched in American law.' [Citation.] As we have noted, a prosecutor can decline to charge, offer a plea bargain, or decline to seek a death sentence in any particular case. [Citation.] Of course, 'the power to be lenient [also] is the power to discriminate,' [citation], but a capital-punishment system that did not allow for discretionary acts of leniency 'would be totally alien to our notions of criminal justice.' [Citation.]"

*Cf. Gregg v. Georgia* (1976), 428 U.S. 153, 199, 49 L. Ed. 2d 859, 889, 96 S. Ct. 2909, 2937 (opinion of Stewart, J., joined by Powell and Stevens, JJ.) (the fact that, under Georgia law, a prosecutor has "unfettered authority" to choose whom he will charge with a capital offense, does not offend the Constitution).

In the instant case, while the survey purportedly evidences the application of prosecutorial discretion, there is virtually no suggestion as to the reasons *why* the death penalty was or was not sought in any given case. The small minority of prosecutors who provided reasons for seeking this penalty primarily stated that the decision was based upon the available evidence and the

strength of their case, the nature of the offense, and the prior record of the accused. Thus, we cannot conclude, and will not assume, that the prosecutors' judgments are based on whim or caprice or otherwise invoke impermissible considerations. We note in this connection that defendant does not claim that the prosecutors in his cases acted arbitrarily in seeking the death sentence. See *McCleskey v. Kemp* (1987), 481 U.S. 279, 296 n.17, 95 L. Ed. 2d 262, 281 n.17, 107 S. Ct. 1756, 1768 n.17 ("Requiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts").

Moreover, this court has previously rejected studies proffered by defendants in an effort to show that the death penalty is arbitrarily imposed, holding that, *inter alia*, "a prosecutor cannot arbitrarily impose the death penalty" since imposition of that penalty is the province and responsibility of the sentencing body. (*People v. Lewis* (1984), 105 Ill. 2d 226, 252; see also *People v. Silagy* (1987), 116 Ill. 2d 357, 372-73.) The prosecutor is authorized only to seek the death penalty, and even then his discretion is not unfettered since he may only do so where one or more statutory aggravating factors exist.

Accordingly, since prosecutors are entitled to exercise discretion in seeking imposition of the death penalty, and since defendant has proffered no evidence indicating that such discretion has been exercised on the basis of impermissible factors, we find that the survey relied upon by defendant is insufficient to establish a substantial showing of a constitutional violation.

Defendant's final claim for post-conviction relief is that execution by lethal injection violates the eighth amendment because of the alleged absence of "guidelines and procedures" to "protect against a torturous

death." Defendant has abandoned, as he must, his related claim asserted in the trial court that approval by the Food and Drug Administration (FDA), for the drugs that would be administered, is required before execution by lethal injection could be performed. See *Heckler v. Chaney* (1985), 470 U.S. 821, 84 L. Ed. 2d 714, 105 S. Ct. 1649 (the FDA's refusal to take investigatory and enforcement action relating to the drugs to be administered for execution by lethal injection is not subject to judicial review).

Section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5) provides, in relevant part:

> "A defendant sentenced to death shall be executed by a continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbituate in combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice." (Ill. Rev. Stat. 1983, ch. 38, par. 119—5(a)(1).)

The provision further requires that "[t]he warden of the penitentiary shall supervise such execution which shall be conducted in the presence of 2 physicians and 6 witnesses ***." Ill. Rev. Stat. 1983, ch. 38, par. 119—5(a)(2)(d).

Thus, the above-quoted portions of section 119—5 do set forth certain general guidelines relating to the "method and manner" of execution. Moreover, defendant fails to suggest what additional guidelines should be required, and fails to cite any authority for the proposition that the absence of these alleged unspecified guidelines renders execution by lethal injection unconstitutional.

We recognize that any method of execution which "involve[s] the unnecessary and wanton infliction of pain" is constitutionally impermissible. (*Gregg v. Georgia* (1976),

428 U.S. 153, 173, 49 L. Ed. 2d 859, 875, 96 S. Ct. 2909, 2925.) However, defendant has submitted *no* evidence which indicates that execution by lethal injection results in protracted death or unnecessary pain. Indeed, this court has previously observed "that commentators and medical experts have urged that death by lethal gas or injection is a more sure, swift, and humane means than [the prior statutory method of] electrocution." *People v. Silagy* (1987), 116 Ill. 2d 357, 372.

Defendant's only "authority" for the proposition that execution by lethal injection may allegedly pose a risk of cruel punishment is language in the United States Court of Appeals' decision in *Chaney v. Heckler* (D.C. Cir. 1983), 718 F.2d 1174, which was reversed on other grounds by the United States Supreme Court (*Heckler v. Chaney* (1985), 470 U.S. 821, 84 L. Ed. 2d 714, 105 S. Ct. 1649).

The issue arose in the context of deciding defendant's claim that the FDA should be required to take investigatory and enforcement action concerning the drugs administered in performing executions by lethal injection. The Court of Appeals held that the FDA could be judicially compelled to take such action because, *inter alia*, its refusal to do so "may also implicate the Eighth Amendment's prohibition of cruel and unusual punishment" insofar as evidence was allegedly presented that execution by injection poses a risk of "cruel, protracted death." *Chaney*, 718 F.2d at 1191.

In reversing the Court of Appeals' decision, the United States Supreme Court determined that the FDA's decision to refrain from taking enforcement action was not subject to judicial review. Although the Court did not directly rule on defendant's eighth amendment claim, it did note that "[n]o *colorable claim* is made in this case that the agency's refusal to institute proceedings violated *any* constitutional rights of [defend-

ants]." (Emphasis added.) *Heckler*, 470 U.S. at 838, 84 L. Ed. 2d at 728, 105 S. Ct. at 1659.

For the reasons stated herein, the trial court's denial of the defendant's post-conviction petitions is affirmed. The clerk of this court is directed to enter an order fixing Tuesday, May 17, 1988, as the date on which the sentences of death entered in the circuit court are to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). A certified copy of this order shall be furnished to the Director of Corrections, to the warden of Stateville Correction Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

The defendant in this case should be given the opportunity to demonstrate, through an evidentiary hearing, whether the death penalty statute is being applied in this State both in a racially discriminatory manner and as a result of the arbitrary and capricious exercise of prosecutorial discretion.

In *McCleskey v. Kemp* (1987), 481 U.S. 279, 95 L. Ed. 2d 262, 107 S. Ct. 1756, a defendant sentenced to death argued that the Georgia death penalty statute was unconstitutional because it violated his rights to equal protection of the laws under the fourteenth amendment. Defendant based his allegation on statistical evidence contained in the Baldus study, showing that black persons were more likely to be sentenced to death than white persons and that murderers of black persons were less likely to be sentenced to death than murderers of white persons. In rejecting his argument, the United States Supreme Court held that in order to prove unconstitutional discrimination the defendant would have to

prove that "the decisionmakers in *his* case acted with discriminatory purpose." (Emphasis in original.) (481 U.S. at 292, 95 L. Ed. 2d at 278, 107 S. Ct. at 1766.) The Court concluded that the Baldus study was "insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with discriminatory purpose." (481 U.S. at 297, 95 L. Ed. 2d at 281-82, 107 S. Ct. at 1769.) However, the Court did not foreclose entirely the possibility that equal protection violations could be proven in an individual case through the use of statistical evidence, stating only that "we would demand exceptionally clear proof before we would infer that the discretion [to implement the death penalty in an individual case] has been abused." 481 U.S. at 297, 95 L. Ed. 2d at 281, 107 S. Ct. at 1769.

Similarly, in rejecting the defendant's eighth amendment challenge, the *McCleskey* Court found that, at most, the study proffered by the defendant "indicates a discrepancy that appears to correlate with race," and therefore concluded that the study "does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital-sentencing process." (481 U.S. at 312, 313, 95 L. Ed. 2d at 291, 292, 107 S. Ct. at 1777, 1778.) Again, the Court did not reject entirely the possibility that a defendant could demonstrate a constitutionally significant risk of racial bias through statistics, but did not articulate a test or threshold showing necessary to establish such a risk.

The majority notes that in *People v. Davis* (1987), 119 Ill. 2d 61 (in which I did not participate), this court rejected a claim similar to the one raised by the defendants in *McCleskey* and in the present case. In *Davis* defendant argued that his death sentence was unconstitutional, based on statistical evidence contained in the Gross study (Gross & Mauro, *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing &*

*Homicide Victimization*, 37 Stan. L. Rev. 27 (1984)). The study concludes there has been racial discrimination in the imposition of the death penalty in Illinois under the current statute. The majority in *Davis*, without analyzing the merits of the Gross study, rejected the defendant's claim on the assumption that the Gross study could be no more compelling than the Baldus study rejected by the Supreme Court in *McCleskey*. The majority in the present case takes the same conclusory approach, brushing aside defendant's arguments with a discussion of *McCleskey*, but without analyzing the Gross study or the merits of the constitutional issues implicated by the study.

In the Gross study, researchers examined the imposition of the death penalty under post-*Furman* statutes in several States, including Illinois. Using primarily data from Supplementary Homicide Reports (SHR's) filed by local police agencies under the Uniform Crime Reporting system between January 1976 and December 1980, researchers tabulated the race of the victim and murderer in each reported homicide. The researchers found that in Illinois a defendant convicted of killing a white victim was about six times more likely to receive the death penalty than the murderer of a black victim. Furthermore, 7.5% of the black defendants who killed white victims received the death penalty, compared with 1.9% of their white counterparts. The researchers then analyzed these racial disparities while controlling for other factors, including felony murder, multiple murder, murder of a stranger, and number of aggravating factors. Even considering these factors, the researchers concluded that "the race of the victim had a sizable and statistically significant effect on the odds of a defendant receiving a death sentence." (37 Stan. L. Rev. at 78.) In Illinois, after controlling for all variables, "the overall odds of an offender receiving the death penalty for killing a white

were 4.0 times greater than for killing a black." (37 Stan. L. Rev. at 79.) The researchers also concluded that in Illinois there was also "some evidence that the race of the suspect had an independent effect on capital sentencing." 37 Stan. L. Rev. at 83.

I believe the seriousness and irrevocability of the penalty in this case, as well as the court's duty to ensure that the laws of this State do not abridge the rights guaranteed by our State and Federal constitutions, entitle defendant to more than the perfunctory consideration of the Gross study and its constitutional implications that this court has thus far afforded him. In *McCleskey*, the United States Supreme Court did not foreclose the possibility that statistical proof could be sufficient to prove constitutional violations in the imposition of the death penalty. That ultimate issue—whether the Gross study is strong enough evidence to prove racial discrimination in defendant's death sentencing—is not before this court, but only the issue whether defendant has made a sufficient showing to warrant a further evidentiary hearing on the matter. I believe, based on the Gross study, that defendant has made such a showing and is thereby entitled to a hearing in which he could present additional evidence in support of the Gross study and his allegation of racial discrimination in his sentencing. Where a defendant's life hangs in the balance, this court's refusal to undertake or allow an examination of the Gross study is significant error.

Moreover, even if *McCleskey* forecloses defendant's arguments under the Federal Constitution, it is beyond dispute that the States may extend rights under their own constitutions beyond those afforded under Federal law. (See, *e.g.*, *Moran v. Burbine* (1986), 475 U.S. 412, 428, 89 L. Ed. 2d 410, 425, 106 S. Ct. 1135, 1145 (while deciding an issue under Federal law, the Court noted: "Nothing we say today disables the states from adopting

different requirements *** as a matter of state law"); McAffee, *The Illinois Bill of Rights and our Independent Legal Tradition: A Critique of the Illinois Lock-Step Doctrine*, 12 S. Ill. U. L.J. 1 (1987).) It is therefore disturbing that this court has apparently rejected any argument that racial disparities in death penalty sentencing, as evidenced by the Gross study, violate the Illinois Constitution, without ever actually considering the merits of such arguments. The majority simply cites *Davis* as authority for the proposition that this court "held that the Gross study could not substantiate a claim under the Illinois Constitution" (121 Ill. 2d at 108), but does not acknowledge that the court's "analysis" of the Illinois constitutional issue in *Davis* consisted of a single sentence: "Nor do we believe that the defendant states a better claim under the due process and equal protection clauses of our State Constitution, particularly since he has not provided us with any separate argument for greater State constitutional protection" (*People v. Davis* (1987), 119 Ill. 2d 61, 68). Because it is obvious that the Illinois constitutional issue was not squarely before the court, the language in *Davis*, at most, leaves the issue undecided. The majority's conversion of the *Davis* language into a statement of settled law is completely unwarranted.

The defendant is also entitled to an evidentiary hearing based on a second ground: his allegations that prosecutorial discretion in Illinois has been exercised in an arbitrary and capricious manner in the imposition of the death penalty. The defendant bases this argument on a survey of Illinois State's Attorney's offices conducted by the Chicago Lawyer. While I agree with the majority that a defendant is not barred by the principles of *res judicata* from raising a challenge to the death penalty statute as applied where he has previously raised a challenge only to the facial validity of the statute, I disagree

with the majority's conclusion that the Chicago Lawyer survey is insufficient to establish a substantial showing of a constitutional violation.

In *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, the United States Supreme Court held that for a capital sentencing scheme to meet constitutional strictures it must afford the defendant an individualized inquiry into the facts and circumstances of the particular crime at issue. This requirement has been consistently reaffirmed in later cases "to ensure that capital sentencing decisions rest on the individualized inquiry contemplated in *Gregg.*" (*McCleskey v. Kemp*, 481 U.S. at 303, 95 L. Ed. 2d at 285, 107 S. Ct. at 1772.) In addition, the Court has rejected capital schemes which require mandatory application of the death penalty, instead endorsing capital sentencing schemes which employ guided discretion. (See, *e.g.*, *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001.) Therefore, the Constitution is not violated by a prosecutor's discretionary decision to show an individual defendant mercy or leniency. *Gregg*, 428 U.S. at 199, 49 L. Ed. 2d at 889, 96 S. Ct. at 2937; *McCleskey*, 481 U.S. at 311-12, 95 L. Ed. 2d at 291, 107 S. Ct. at 1777.

The Chicago Lawyer survey responses reveal, however, that the discretion of Illinois prosecutors in capital sentencing decisions is being exercised in an extremely disparate fashion, and in some cases is not being exercised to show defendants mercy or leniency, but quite the opposite. The policy of some prosecutors, such as those in De Kalb, Gallatin, and Champaign Counties, is apparently to seek the death penalty in each and every death-eligible case, regardless of the particular facts and circumstances involved. Policies such as these fly in the face of the particularized sentencing and guided discre-

tion procedures envisioned by the United States Supreme Court in *Gregg*. In fact, such inflexible and automatic sentencing policies seem dangerously akin to the mandatory sentencing schemes denounced by the Court in *Woodson* and *Roberts*.

On the other hand, the Chicago Lawyer survey reveals at least two State's Attorney's offices, in Rock Island and Sangamon Counties, which during the period of the study apparently *never* sought the death penalty in a death-eligible case. The prosecutorial policies of other offices fall somewhere in between, with many different approaches to reaching the decision to seek the death penalty, including case-by-case analysis and consultation with the Illinois Attorney General's office.

As the majority acknowledges, this court has envisioned particularized use of prosecutorial discretion in capital sentencing procedures. In *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, in the words of the majority, "this court recognized that the death penalty would not be sought in every 'death-eligible' case. Rather, the decision to seek a death sentence will depend on various factors, such as an 'estimate of what testimony and other evidence will be available and its persuasive effect.'" (121 Ill. 2d at 110-11, quoting *Cousins*, 77 Ill. 2d at 543.) The policies of some Illinois prosecutors to always seek the death penalty, regardless of the particular facts or circumstances of the case, demonstrate how far the exercise of prosecutorial discretion in Illinois has strayed from the spirit of *Cousins*. Obviously, the decision to seek the death penalty, at least in the hands of some Illinois prosecutors, does not depend on the "various factors" envisioned by the *Cousins* court, but is a purely automatic response to a finding of death eligibility.

Moreover, that the defendant was properly found to be death eligible under the statute should not end the in-

quiry into whether the decision to impose the death penalty was proper, because an otherwise constitutional finding of death eligibility may be rendered improper by subsequent arbitrary exercises of prosecutorial discretion. The Supreme Court has now made clear that even if the first step of a particular procedure adequately protects a defendant's constitutional rights, a prosecutor may not then resort to tactics which impinge upon those constitutional rights at a later stage of the proceedings. In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the Court held that even though a jury venire has been constitutionally impaneled, a prosecutor's subsequent discriminatory use of peremptory challenges constitutes a violation of the defendant's constitutional rights.

The situation presented by this case is analogous: defendants are found to be death eligible through application of a statute which provides specific variables consistent with the requirements of *Gregg*. However, by subsequent application of a prosecutor's inflexible policy to always seek the death penalty for death-eligible defendants, the constitutional guarantees of particularized sentencing and guided discretion provided under the statute are destroyed. Prosecutors should not be allowed to pervert one of the final steps in the State's determination of which defendants will be sentenced to death by resorting to automatic death-sentencing decisions instead of consideration of the particular facts and circumstances of each case. To allow imposition of a death sentence under such circumstances is as ridiculous as allowing a defendant to be sentenced to death by a judge or jury which has a stated policy of always imposing the death penalty on death-eligible defendants, no matter what the circumstances or evidence. To avoid arbitrary and capricious imposition of the death penalty, *each step* of the sentencing process, including the prosecutor's de-

cision whether or not to seek the death penalty in a particular case, must be governed by the exercise of rational, guided discretion as envisioned in *Gregg*.

Finally, the majority's argument that " 'a prosecutor cannot arbitrarily impose the death penalty' since imposition of that penalty is the province and responsibility of the sentencing body" (121 Ill. 2d at 112, quoting *People v. Lewis* (1984), 105 Ill. 2d 226, 252) is not persuasive. Without the prosecutor's decision to seek the death penalty in a particular case, the sentencing authority would never even be given the opportunity to impose a sentence of death. Thus, the majority's assertion that the decision whether a defendant will receive the death penalty belongs entirely to the judge or jury is misleading, for without the prosecutor's crucial decision to seek the death penalty, no defendant could ever be sentenced to death.

At the very least, therefore, to abide by the spirit of *McCleskey* and *Gregg* and ensure this defendant fair and adequate review of the issues raised by his case, this court should allow defendant an evidentiary hearing (such as the hearing given to the defendant in *McCleskey*) so that defendant would have the opportunity to demonstrate, if he could, that racial variables and arbitrary prosecutorial discretion played an unconstitutional role in his death sentencing. For these reasons, I believe defendant is entitled to an evidentiary hearing and I respectfully dissent.