**Raymond Lee STEWART,
Petitioner–Appellant,**

**v.**

**Michael LANE, Director, Illinois Department of Corrections; and Howard Peters, Warden, Respondents–Appellees.**

No. 93–2586.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 22, 1994.[1]

Decided July 13, 1995.

---

1. This case originally was argued to this panel on June 14, 1994. On June 17, 1994, the Supreme Court decided *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In order to determine *Simmons*'s applicability to the instant case, we allowed the parties to submit additional briefs and heard further argument on November 22, 1994.

Joshua Sachs, Chicago, IL (argued), for Raymond L. Stewart.

Rita M. Novak, Office of Atty. Gen., Chicago, IL, Steven J. Zick (argued), Office of Atty. Gen., Crim. Appeals Div., Chicago, IL, for Michael P. Lane.

Rita M. Novak, Office of Atty. Gen., Chicago, IL, for Howard A. Peters, III.

Before COFFEY, FLAUM, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

In 1981, Raymond Lee Stewart was convicted and sentenced to death in two separate trials for three murders. After unsuccessfully appealing his convictions and death sentences in Illinois courts, Stewart filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied Stewart's petition. We now affirm.

## I.

Raymond Lee Stewart was convicted and sentenced to death for the murders of Willie Fredd, Albert Pearson, and Kevin Kaiser. Stewart had two trials: one for the Fredd and Pearson murders, and a second for the Kaiser murder. This case has progressed through state and federal courts for thirteen years, and detailed descriptions of the facts have been set out in the opinions in Stewart's direct appeals, 105 Ill.2d 22, 85 Ill.Dec. 241, 473 N.E.2d 840 (1984) (Fredd/Pearson); 104 Ill.2d 463, 85 Ill.Dec. 422, 473 N.E.2d 1227 (1984) (Kaiser), and the district court's habeas decision, No. 89 C 20188, 1993 WL 207807 (N.D.Ill. June 8, 1993). We therefore discuss only the facts relevant to this habeas action.

Stewart had two bifurcated trials with sentencing hearings before a jury. At sentencing in the Fredd/Pearson murders, the prosecution argued for the death penalty by describing Stewart's long history of violent acts, his lack of remorse, and the absence of any rehabilitation. After emphasizing that rehabilitation was unlikely, the prosecution argued to the jury to do "everything in [its] power to make sure that this defendant doesn't get out, be released and kill another innocent victim."

During the sentencing phase of the Kaiser case, the government painted a similar picture of Stewart's long and violent criminal history. The prosecution then argued that "Stewart ... is very special, he's dangerous, he's desperate to escape." In addition, the following exchange took place during the defense's closing argument:

> [Mr. Berry—defense counsel]: You will be instructed on the death penalty phase and you will see in one of the instructions that if you find any mitigating factor then you may impose a sentence other than the death penalty and the judge would probably impose life without parole.
>
> [Mr. Koski—state's attorney]: Objection, that improperly states the law.
>
> [The Court]: Objection sustained. The sentence other than the death penalty is of no concern to this jury.

The trial court did not instruct the jury that Stewart was ineligible for parole under Illinois law. See 730 ILCS 5/5–8–1 (formerly Ill.Rev.Stat., Ch. 38, § 1005–8–1(a)(1)(c)).

The jury sentenced Stewart to death for the Fredd/Pearson murders on January 27, 1982, and another jury sentenced him to death for the Kaiser murder on May 6, 1982. On direct review, the Illinois Supreme Court affirmed Stewart's convictions and sentences. 104 Ill.2d 463, 85 Ill.Dec. 422, 473 N.E.2d 1227 (1984) (Kaiser); 105 Ill.2d 22, 85 Ill.Dec. 241, 473 N.E.2d 840 (1984) (Fredd/Pearson). The United States Supreme Court denied review of the Kaiser case on May 20, 1985, 471 U.S. 1120, 105 S.Ct. 2368, 86 L.Ed.2d 267 (1985), and the Fredd/Pearson case on May 28, 1985, 471 U.S. 1131, 105 S.Ct. 2666, 86 L.Ed.2d 283 (1985).

In each case, Stewart filed a timely petition for collateral review under the Illinois Post–Conviction Hearings Act. 725 ILCS 5/122–1. The Circuit Court denied relief on both petitions without holding evidentiary hearings. The Illinois Supreme Court affirmed these decisions, 121 Ill.2d 93, 117 Ill.Dec. 187, 520 N.E.2d 348 (1988), in a consolidated opinion, and eight months later the United States Supreme Court again denied review. 488 U.S. 900, 109 S.Ct. 246, 102 L.Ed.2d 234 (1988) (Kaiser); 488 U.S. 987,

109 S.Ct. 544, 102 L.Ed.2d 574 (1988) (Fredd/Pearson). Stewart filed a second post-conviction petition in each case. The Circuit Court dismissed these petitions on May 4, 1989, and the Illinois Supreme Court affirmed these dismissals on November 20, 1990. 141 Ill.2d 107, 152 Ill.Dec. 286, 565 N.E.2d 968 (1990). Again, the United States Supreme Court denied certiorari. 502 U.S. 853, 112 S.Ct. 162, 116 L.Ed.2d 126 (1991).

Stewart filed petitions for habeas corpus relief in the United States District Court for the Central District of Illinois on May 1, 1989. These petitions were transferred to the Northern District of Illinois, Western Division. Because the second set of post-conviction petitions was still pending, the district court (Judge Roszkowski) dismissed Stewart's habeas petitions without prejudice. After the conclusion of all of the proceedings on his second post-conviction petitions, the district court (Judge Reinhard) allowed Stewart to reinstate his habeas petitions, which he did on November 10, 1992. On June 8, 1993, the district court consolidated and denied his petitions. This appeal followed.

## II.

Stewart raises several issues in this habeas appeal, but the central question before this Court is whether the prosecutor's arguments regarding Stewart's future dangerousness, combined with the trial court's failure to instruct the jury on Stewart's ineligibility for parole, violated his rights under the Due Process Clause. Stewart contends that the Supreme Court's decision in *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), requires that we vacate his death sentence in both cases on these grounds.

In *Simmons,* the state argued during the penalty phase of the defendant's trial that the jury should consider the defendant's future dangerousness in deciding whether to sentence him to death. The trial court refused, over defense objections, to instruct the jury that the defendant was ineligible for parole under South Carolina law. During deliberations, the jury asked the trial court whether life imprisonment carried with it the possibility of parole. The court instructed the jury not to consider parole in reaching its verdict and stated that it should understand the terms "life imprisonment" and "death sentence" to have their plain and ordinary meaning. The jury shortly thereafter returned a sentence of death. A plurality of the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." —— U.S. at ——, 114 S.Ct. at 2190.

In the instant case, Stewart maintains that the state placed his future dangerousness in issue during its closing arguments at both sentencing hearings. Stewart contends that the trial court erred in not instructing the jury that he was ineligible for parole because under Illinois law, the only alternative to a death sentence is a sentence of natural life in prison without possibility of parole. 730 ILCS 5/5–8–1. Therefore, Stewart argues, *Simmons* requires us to vacate and remand for resentencing. Before we can address the merits of Stewart's claims, however, we first must determine whether, in light of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), which generally forbids federal courts from applying "new rules" of federal law on habeas review, we can apply *Simmons* retroactively to Stewart's case. In addressing the retroactivity problem, we assume, without so holding, that *Simmons* would dictate a different result here.

## A.

"The application of *Teague* is a threshold question in a federal habeas case." *Goeke v. Branch,* —— U.S. ——, ——, 115 S.Ct. 1275, 1276, 131 L.Ed.2d 152 (1995) (*per curiam* ); *Caspari v. Bohlen,* —— U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). We need not entertain the *Teague* defense, however, if the State fails to argue it. *Goeke,* —— U.S. at ——, 115 S.Ct. at 1276. In the instant case, after the Supreme Court announced its decision in *Simmons,* and after Stewart filed his supplemental brief arguing *Simmons's* application to his case, the State responded that *Simmons* was a

new rule of criminal procedure and therefore barred by *Teague.* Thus, the State sufficiently preserved its *Teague* argument.

■ "[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Caspari,* —— U.S. at ——, 114 S.Ct. at 954 (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070) (emphasis in original); *Gilmore v. Taylor,* —— U.S. ——, ——, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306 (1993); *Graham v. Collins,* —— U.S. ——, ——, 113 S.Ct. 892, 897, 122 L.Ed.2d 260 (1993); *Stringer v. Black,* 503 U.S. 222, 227, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992). As *Caspari* most recently instructed, we apply *Teague* by proceeding in three steps. —— U.S. at ——, 114 S.Ct. at 953. First, we determine the date on which Stewart's convictions and sentences became final for *Teague* purposes. *Id.* Second, we must "[s]urve[y] the legal landscape as it then existed," *Graham,* —— U.S. at ——, 113 S.Ct. at 898, and determine whether a state court considering Stewart's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the Constitution requires the rule he seeks. *Caspari,* —— U.S. at ——, 114 S.Ct. at 953; *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990). Finally, if we conclude that Stewart seeks the benefit of a new rule, we must decide whether that rule falls within one of the two narrow exceptions to *Teague.* *Caspari,* —— U.S. at ——, 114 S.Ct. at 953; *Taylor,* —— U.S. at ——, 113 S.Ct. at 2113.

### B.

■ "A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely petition has been finally denied." *Caspari,* —— U.S. at ——, 114 S.Ct. at 953. We measure the date on which Stewart's convictions became final by the date that the United States Supreme Court denied his petitions for certiorari on direct review of his convictions and sentences. *See Penry v. Lynaugh,* 492 U.S. 302, 314, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989). Stewart's convictions thus became final on May 20, 1985, and May 28, 1985. *See* 471 U.S. 1120, 105 S.Ct. 2368, 86 L.Ed.2d 267 (1985) (Kaiser); 471 U.S. 1131, 105 S.Ct. 2666, 86 L.Ed.2d 283 (1985) (Fredd/Pearson).

### C.

■ Because the leading purpose of habeas review is to ensure that state courts conduct criminal proceedings in accordance with the Constitution as interpreted at the time of those proceedings, "the new rule principle ... validates reasonable, good faith interpretations of existing precedents made by state courts." *Butler v. McKellar,* 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). "This principle adheres even if those good faith interpretations 'are shown to be contrary to later decisions.' " *Graham,* —— U.S. at ——, 113 S.Ct. at 898 (quoting *Butler,* 494 U.S. at 414, 110 S.Ct. at 1217). Unless reasonable jurists would have felt compelled by precedent existing at the time his convictions became final to rule in Stewart's favor, we are barred from doing so now. *Graham,* —— U.S. at ——, 113 S.Ct. at 903.

■ After reviewing the state of the law in May, 1985, we conclude that the rule sought by Stewart and recognized by the *Simmons* Court, was not dictated by existing precedent. *Simmons* relies primarily on *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), and *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Stewart cannot benefit from the rule of *Skipper,*[2] however, because the Supreme

---

**2.** *Skipper* held that a defendant was denied due process by the state trial court's refusal to admit evidence of his good behavior in prison during the penalty phase of his capital trial. The Court explained that:

Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death on the basis

Court rendered its decision in that case eleven months after Stewart's convictions became final. *Cf. Teague,* 489 U.S. at 301, 109 S.Ct. at 1070. The question therefore becomes whether *Simmons* was compelled by precedent other than *Skipper,* specifically *Gardner.*[3]

In *Gardner,* the defendant was convicted of first degree murder. The sentencing jury found that mitigating circumstances outweighed aggravating factors and recommended a life sentence. The trial court, however, relying on confidential information in the presentence report that neither party had the opportunity to challenge, found no mitigating circumstances and sentenced Gardner to death. The Supreme Court vacated Gardner's sentences, holding that the Florida trial court had failed to follow fundamental procedures required prior to the imposition of the death penalty. 430 U.S. at 358, 361, 97 S.Ct. at 1204–05, 1206; *Id.* at 363, 97 S.Ct. at 1207 (White, J., concurring). Relying on *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a three-justice plurality concluded that the trial judge's secrecy regarding the presentence report denied the defendant constitutionally-guaranteed procedures. In rejecting the state's rationales for the trial court's non-disclosure, the Court held that the Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain." *Id.* at 362, 97 S.Ct. at 1207. The Court found that states must administer sentencing procedures with an even hand and if they do not, their procedures will be "subject to the defects which resulted in the holding of unconstitutionality in *Furman v. Georgia.*" 430 U.S. at 361, 97 S.Ct. at 1206. The *Gardner* plurality, addressing the situation where the trial judge did not follow the jury's sentencing recommendation, did not base its decision

on a misleading of the jury or the defendant's right to meet the state's case against him; rather, the plurality rested on the general notion that because death is different, it requires a heightened degree of procedural fairness. *Id.*

Does *Gardner* compel *Simmons?* The two decisions share common constitutional ground: they address what information the Due Process Clause requires the state to afford the defendant at sentencing the opportunity to deny or explain. And, given the Court's reliance on *Gardner* in *Simmons,* *Simmons* clearly emerges from the teachings of *Gardner.* This nexus is not sufficient, however, to lift Stewart over the hurdle erected by *Teague* and elevated by its progeny.

The fact that *Gardner* lends general support to the conclusion reached in *Simmons* does not mean that state courts should have predicted *Simmons* as a further development in Due Process jurisprudence. *Gardner* established the broad principle that in a capital case, the state cannot base a death sentence on information to which the defendant had no notice and no opportunity to respond. The *Gardner* court was not concerned with the substance of the confidential report; the procedural unfairness in its secrecy alone was enough to render its use unconstitutional. *Simmons* went much further and addressed the issue of what specific information the defendant must have the opportunity to rebut. Moreover, *Simmons,* unlike *Gardner,* focused on the narrow question of the precise type of information the defendant must be allowed to present, or have the court present, to the jury in rebuttal. The broad principles announced in *Gardner* thus laid the foundation for *Simmons,* but they are at too high a level of generality to compel it. *Cf. Sawyer,* 497 U.S. at 236, 110 S.Ct. at 2828. "Even if we were to agree with [petitioner's] assertion that [the] decisions ... inform or even control or govern, the analysis of his claim, it

---

of information which it had no opportunity to deny or explain.
476 U.S. at 5 n. 1, 106 S.Ct. at 1671 n. 1 (internal punctuation and citations omitted).

**3.** Although the Court in *Simmons* noted that "[t]he principle announced in *Gardner* was reaf-

firmed in *Skipper,* and it compels our decision today," —— U.S. at ——, 114 S.Ct. at 2194, the fact that a court says its decision is controlled by a prior holding is not conclusive or dispositive for the purposes of deciding whether the relevant decision is a new rule under *Teague. See Butler,* 494 U.S. at 415, 110 S.Ct. at 1217–18.

does not follow that they compel the rule that [petitioner] seeks." *Id.*

■ Indeed, precedent existing in 1985 indicated that a state court could safely reach an opposite result in a *Simmons*-type case. In *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Supreme Court granted states the exclusive right to determine what a sentencing jury must be told, and Illinois law did not then mandate an instruction such as the one Stewart now claims was required. The Illinois Supreme Court, unanimous on this point, held in 1984 that "[i]t was not error for the trial judge to instruct the jury that the alternative to the death penalty was imprisonment, without explaining that life imprisonment was the only statutory alternative to the death penalty." *People v. Albanese*, 102 Ill.2d 54, 79 Ill.Dec. 608, 621–22, 464 N.E.2d 206, 219–20 (1984). The Illinois Supreme Court altered its stance four years later in *People v. Gacho*, in which it held that capital sentencing juries must be instructed, when appropriate, that if sufficient mitigating factors exist to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment without parole or release. 122 Ill.2d 221, 119 Ill.Dec. 287, 306, 522 N.E.2d 1146, 1165 (1988). Yet *Gacho*, recognizing the mandate of *Ramos*, relied entirely on state law in reaching its result. *Id.* 119 Ill.Dec. at 307, 522 N.E.2d at 1166. As we have said before, state law errors (assuming we could construe this as an error) provide no basis for relief on habeas. *Taylor*, —— U.S. at ——, 113 S.Ct. at 2119; *Estelle v. McGuire*, 502 U.S. 62, 67–69, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Thomas v. Peters*, 48 F.3d 1000, 1003 (7th Cir.1995). There is no hint in *Gacho* that the requirements of due process in any way compelled the result. Moreover, the *Gacho* court realized that its result would depart from its previous position and made the rule of its

case prospective. *Id. Gacho*, on its own terms, prohibited its application to Stewart's case.

■ Neither *Gardner* nor any other case as of 1985 should have enabled state courts to predict the result in *Simmons*. Therefore, the principle established in *Gardner* was simply too general to enable state courts to predict the result in *Simmons*. *Cf. Sawyer*, 497 U.S. at 236, 110 S.Ct. at 2828.[4] *Simmons* falls within *Teague's* definition of new rules that includes "gradual developments in the law over which reasonable jurists may disagree." *Id.*

**D.**

Finally, because Stewart seeks the benefit of a rule not dictated by precedent at the time his conviction became final, we "must decide whether the rule falls within one of the two narrow exceptions to the nonretroactivity principle." *Caspari*, —— U.S. at ——, 114 S.Ct. at 953. The first exception to *Teague* includes rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073 (internal punctuation omitted). Stewart does not contend that this exception applies to his case.

■ The second exception, which Stewart does contend is at issue, encompasses "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Goeke*, —— U.S. at ——, 115 S.Ct. at 1278; *Saffle*, 494 U.S. at 495, 110 S.Ct. at 1264. In determining whether this exception applies, we must ask if the rule "alter[s] our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Sawyer*, 497 U.S. at 241, 110 S.Ct. at 2831 (internal punctuation omitted). This exception is limited to

---

4. We might have been presented with a different case if Stewart's convictions had become final *after* the Supreme Court decided *Skipper*, because it is arguable that *Skipper* compels the result in *Simmons*. The plurality noted that the refusal to inform the jury about parole ineligibility "cannot be reconciled with our well-established precedents interpreting the Due Process Clause." *Simmons*, —— U.S. at ——, 114 S.Ct. at 2195; *Id.* —— U.S. at ——, 114 S.Ct. at 2198 ("An instruction directing the jury not to consider the defendant's likely conduct in prison would not have satisfied due process in *Skipper*, and, for the same reasons, the instruction issued by the trial court in this case does not satisfy due process.") (citation omitted). Given the timing of Stewart's convictions and Supreme Court decisions, we do not visit that question.

the "small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." *Graham*, —— U.S. at ——, 113 S.Ct. at 903. As the plurality cautioned in *Teague*, "[b]ecause we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of fundamental due process have yet to emerge." 489 U.S. at 313, 109 S.Ct. at 1077. We cannot conclude that denying Stewart jury instructions regarding parole ineligibility after the state has raised the issue of future dangerousness "seriously diminish[ed] the likelihood of obtaining an accurate determination" in his sentencing proceedings, *see Butler*, 494 U.S. at 416, 110 S.Ct. at 1218, or affected the determination of innocence or guilt. *See Teague*, 489 U.S. at 313, 109 S.Ct. at 1076–77. Accordingly, we find the second *Teague* exception inapplicable.

### III.

■■ Stewart raises several additional arguments, all without merit. First, Stewart argues that even if we do not apply *Simmons*, the prosecutor's alleged affirmative misstatements of the law denied Stewart due process. He contends that the prosecutor's comment to the jury in the Fredd/Pearson case that the jurors must make sure "this defendant doesn't get out," was an affirmative misstatement of the law because under Illinois law, Stewart was ineligible for parole. Stewart has waived these claims because, as he concedes, he failed to object to the argument at trial and did not raise this issue on direct appeal. Stewart maintains, however, that the waiver is the result of ineffective assistance of his trial and appellate counsel.

Stewart contends that he received inadequate representation of counsel at sentencing and on appeal. Specifically, Stewart argues that his trial counsel was unaware of controlling law mandating life in prison without parole if a death sentence were not imposed, as evidenced by his failure to obtain an accu-

rate instruction, failure to object to or correct a highly inaccurate and prejudicial prosecutorial argument, and his own inaccurate and prejudicial misstatement of the law. He also argues that his counsel on direct appeal to the Illinois Supreme Court failed to know, clarify and argue the applicable sentencing law, thus leading to his waiver of these issues and the court's affirmance of his sentences.

■■ As Stewart concedes, he did not challenge the effectiveness of his counsel on direct appeal or in his first post-conviction petition or its appeal; these contentions were first raised during Stewart's second post-conviction petition.[5] With regard to the ineffective assistance of trial counsel claims, the Illinois Supreme Court and the district court properly concluded that they were unreviewable for reasons of waiver and *res judicata*. *See* 152 Ill.Dec. at 291, 565 N.E.2d at 973. As for his assertions of ineffective assistance of appellate counsel, Stewart points to a change in his counsel as the reason behind his failure to timely raise the issue. His failure will still result in waiver unless Stewart shows cause for his procedural default, and prejudice resulting from the alleged constitutional violation. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977); *Barnhill v. Flannigan*, 42 F.3d 1074, 1077 (7th Cir.1994). In order to establish prejudice, Stewart must show "not merely that the errors of his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1595, 71 L.Ed.2d 816 (1982); *Lemons v. O'Sullivan*, 54 F.3d 357 (7th Cir.1995). Even unreasonable error on the part of counsel will not warrant setting aside the judgment unless the outcome of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Flannigan*, 42 F.3d at 1078. We agree with the Illinois Supreme Court and the district court

---

**5.** Upon presenting these arguments in his second post-conviction petition, the circuit court dismissed the petition, holding that successive post-conviction petitions are not permitted under Illinois law. On appeal, the Illinois Supreme Court affirmed this dismissal. 141 Ill.2d 107, 152 Ill. Dec. 286, 565 N.E.2d 968 (1990).

that Stewart has failed to prove ineffective assistance of counsel because he has not shown the required prejudice.

▇ Finally, in a separate argument, Stewart contends that the Illinois Supreme Court's decision in *Gacho* to apply its rule prospectively, and therefore not to Stewart, was arbitrary and capricious and denied him equal protection under the law. Contrary to Stewart's assertions, courts are entitled to refuse to apply new state court decisions retroactively. *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), only requires that state courts apply new federal constitutional rules to defendants whose cases are on direct appeal at the time of the decision. Thus, Stewart, whose case was on collateral review at the time of *Gacho,* a case decided on the basis of *state* law, does not fall within the ambit of *Griffith.*

For the foregoing reasons, the district court's denial of Stewart's habeas petition is therefore AFFIRMED.

RIPPLE, Circuit Judge, concurring.

As the court notes, *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), is "a threshold question in a federal habeas case." *Goeke v. Branch,* —— U.S. ——, ——, 115 S.Ct. 1275, 1276, 131 L.Ed.2d 152 (1995) (per curiam). However, we need not entertain a *Teague* defense if the state fails to argue it. *Id.* The *Teague* rule, although "grounded in important considerations of federal-state relations," is not " 'jurisdictional.' " *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990). Therefore, as the court correctly points out, the Supreme Court has held that a federal court may decline to apply *Teague* if the state waived it, but need not. *Caspari v. Bohlen,* —— U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994) (citing *Schiro v. Farley,* —— U.S. ——, ——, 114 S.Ct. 783, 788, 127 L.Ed.2d 47 (1994)). Our jurisprudence has yet to develop guiding principles as to when our court ought to raise *Teague* despite the failure of the state to do so. Because, in a capital case, invocation of *Teague* can often mean the difference between life

and death for the petitioner, we need to be particularly circumspect as to when we shall invoke *Teague* sua sponte.

At first glance, this case might appear to be one in which we need not confront the issue of state waiver. After this appeal was under submission, the Supreme Court decided *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In its supplemental brief, the state argued that *Teague* precluded the application of *Simmons* in this case because *Simmons* set forth a "new rule." It must be remembered, however, that the petitioner came to this court, and indeed to the district court,[1] with a federal claim about the jury's lack of knowledge of parole ineligibility long before the Supreme Court's decision in *Simmons.* It therefore was incumbent on the state to raise the *Teague* defense, if it wished to rely upon it, much earlier than in the supplemental briefing that followed *Simmons.* If its invocation at early stages was inadequate, we are indeed confronted with the issue of whether the state's later invocation redeems its earlier failure to raise the issue.

In its opening brief in this court, the state simply noted in a footnote that *Teague* was dispositive of the petitioner's claim. *See* Appellee's Br. at 5 n. 1. Our case law makes clear, at least with respect to substantive issues, that "nonchalant" treatment of an issue is not sufficient to raise the matter. *See United States v. Eddy,* 8 F.3d 577, 583 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994); *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.), *cert. denied,* 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). If this case law were applied in an even-handed fashion to the state's initial footnote, the state would indeed have difficulty justifying its handling of the matter. It appears, however, that a somewhat less stringent standard governs the state's invocation of *Teague.* The Supreme Court has instructed that we are to employ the standard that it employs in determining whether a federal question presented to it on certiorari was sufficiently presented

---

1. Because the petitioner has raised no specific objection in this court, we need not address

whether *Teague* was raised adequately in the district court.

to the state courts. *See Goeke*, — U.S. at —, 115 S.Ct. at 1276 (citing *Webb v. Webb*, 451 U.S. 493, 101 S.Ct. 1889, 68 L.Ed.2d 392 (1981)). In examining its own jurisdiction to review a state court judgment, the Supreme Court has required that "the record as a whole show[ ] either expressly or by clear implication that the federal claim was adequately presented in the state system." *Webb*, 451 U.S. at 496–97, 101 S.Ct. at 1892. The record must demonstrate that the state courts were "apprised of the nature or substance of the federal claim." *Id.* at 501, 101 S.Ct. at 1894. By analogy, therefore, we are to determine whether the state has made a sufficient effort to "alert [the court] to the *Teague* problem" and to provide the court "with ample opportunity to make a reasoned judgment on the issue." *Goeke*, — U.S. at —, 115 S.Ct. at 1276.

If we apply the *Goeke–Webb* approach to only the state's initial submission in this case, the state has failed to assert adequately the *Teague* defense. The petitioner noted in his opening brief that *Simmons* was before the Supreme Court on certiorari. Even though he stated, "[a]ppellant is aware of no case in which a federal court has decided the constitutional issues presented here," Appellant's Br. at 19, he also cited both *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), and *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), for the proposition that a capital defendant has the right not to be sentenced on the basis of information he did not have the opportunity to rebut. The state did not respond to that federal case law. Its terse *Teague* argument, in a footnote, referred only to *People v. Gacho*, 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 *cert. denied*, 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988), an Illinois Supreme Court decision based on state law. It did not reply to Mr. Stewart's presentation of a federal question by his reliance on *Gardner* and *Skipper*.

Because the state's initial submission was inadequate, we must face the issue of wheth-

er its later submission, after the advent of *Simmons*, cures, in a principled manner, the earlier defect. Given the standard enunciated by the Supreme Court—that the court be adequately apprised of the nature of the *Teague* argument—I believe that we can rely on *Teague* in this case. At the time of final submission,[2] the state had fulfilled its obligation and this court, as it took the case for decision, was apprised adequately of the basis of the state's *Teague* argument. On this basis, I join the judgment and the opinion of the court.

---

2. *Cf. Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990) (noting that the Court inquired at oral argument as to whether the state intended to waive *Teague,* but not indicating whether invocation of the doctrine at that point would have sufficed).